## Ex parte, Dawson.

### In the matter of the Guardianship of MARY JAY DAWSON, an infant.

Where an infant, a native citizen of the State of New York, and domiciled in the City of New York, and having a guardian duly appointed at the place of domicil, was clandestinely, and adversely to the wishes of the guardian, removed from his jurisdiction and taken to England—*Held*, That the guardian was justified in attempting to recover the custody of the ward, by invoking the aid of the English Courts, and that the expenses of such proceeding were a proper charge on the infant's estate.

And where the English Court of Chancery, when refusing to award the custody of the minor to the American guardian, decreed that the guardian should transmit the income of the minor's property to England to be disposed of under the direction of that Court—*Held*, That under the circumstances, there was no good reason for deferring *ex comitate* to the decision of the foreign tribunal, and permission was therefore refused to the guardian to transmit the funds abroad.

The Surrogate, in respect to minors residing in his county, has the same extent of authority as to the appointment of guardians, as was possessed by the late Court of Chancery of this State, whose jurisdiction was commensurate with that of the English Court of Chancery. The statute directing such notice to be given to the relatives residing in the county as the Surrogate shall think reasonable, does not exclude that officer from directing notice to any parties likely to be interested in the welfare of the minor, whether residing in the county or State, or even in a foreign country.

In making the appointment of guardian, the Surrogate's power and discretion are entirely unlimited, except by such known and established principles as_govern the conscience of all Courts of Equity. Relatives, whether residing in another county or State, may be appointed to the guardianship, if they are proper persons, and give the requisite security. The consent of relatives is not requisite to the appointment. The authority of the Surrogate is not limited in this respect—the relatives have no control in the matter, and they have no interest as parties, but receive notice merely to inform the Court so as to make the best appointment for the welfare and interests of the child.

The Surrogate possesses power to remove a guardian on proper cause being shown.

The powers of a guardian appointed by the Surrogate are not restricted by locality, more than in the case of any other officer in this State. He is recognized as the lawful guardian throughout the bounds of the State. He cannot, in a strict sense, exercise authority out of this State, but he is no more a local officer than an executor, or administrator, or a guardian appointed by the Court of Chancery. Except as connected by the Constitution of the United States, which does not touch the civil domestic government, New York is as much a foreign State, relatively to the other States of the Union, as England is relatively to France.

There is no reason why the same degree of comity should not be extended to the judicial action of the Surrogates' Courts in the State of New York, that would be extended to any other tribunal of a foreign country in the exercise of its legitimate jurisdiction.

From comity and considerations of mutual interest, foreign States recognize and give effect almost universally to those laws of the domicil which constitute the *status*, quality, or capacity of the person, and which place minors under the authority of guardians and tutors, respect being had to the sentence of the appropriate tribunal in the place of domicil.

In the case of a minor born in the City of New York, of a father there resident, a naturalized citizen, and a mother there resident a native citizen, the residence of the parents there continuing until their decease, the place of birth and the domicil of the parents made New York the place of the domicil of the child.

The domicil of origin can be changed only by choice, and a domicil of choice cannot be acquired by the act of the minor, or of any other person except the parents or the guardian.

By the common law an alien signifies one born in a foreign country, and it is the doctrine of the English law that natural born subjects cannot divest themselves of the duty of allegiance to the country of their nativity. The statutes giving to the children of natural born subjects the rights of English natural born subjects, though born in a foreign country, are statutes of naturalization, giving certain privileges without the volition of the subject and without the condition of residence. If they determine imperatively the *status* of the natives of other countries, they conflict with the doctrine of natural allegiance, and also with the rights of the citizens of other States, and with the sovereignty of other governments.

THE SURROGATE.—The father of Mary Jay Dawson, a minor, was a native of England, whence, at the age of sixteen years, he came with his father to this country to reside. He subsequently renounced his allegiance to the Crown of Great Britain, and became a naturalized citizen of the United States. His residence was in the city of New York from anterior to his marriage until his decease in 1852. The mother of the infant was a native of the United States and a resident of this city, where she died in 1846. The minor was born in New York in the year 1842, and inherited from her mother a large estate situated in this place.

In June, 1852, I appointed Miss Mary Ann Dawson, a paternal aunt, guardian of the infant, after objections made on the part of some of the maternal relatives had been withdrawn, upon the consent of the guardian being given that her ward should continue to reside in the United States. Miss Dawson having subsequently retracted that consent, and expressed her desire to renounce her guardianship, her letters were superseded in October, 1852, and Miss Eliza C. Jay was appointed in her stead. Her ward being concealed, Miss Jay thereupon instituted a suit in the Supreme Court, and procured an injunction to restrain the removal of the minor from the State. The service of this process was avoided until the infant was clandestinely taken to England. Miss Jay proceeded to that country, and set on foot proceedings for the purpose of procuring the custody of her ward, in which she was not only unsuccessful, but was ordered by the Court of Chancery to transmit the income of the minor's property to England, to be disposed of under the direction of that court. The present application is made to me for instructions in respect to a compliance with the order of the Lord Chancellor, and also for an allowance of the expenses incurred in the attempt to recover the custody of the minor.

Some remarks which fell from Sir John Stuart, the Vice-Chancellor, in respect to the jurisdiction of the Surrogate's Court, render it necessary to correct a mistake as to the powers of this court. And first, as to the appointment of

guardians : the Surrogate, in respect to all minors residing in his county, has the same extent of authority as the late Court of Chancery, and that court possessed the same power as the English Court of Chancery. (2 *R. S., p.* 173). It is true, the statute directs such notice of the application to be given to the relatives residing in the county as the Surrogate "shall on due inquiry think reasonable," and "on such relatives only as the Surrogate shall direct;" but there is nothing in the world to exclude the Surrogate from making the broadest inquiries possible, and directing notice to parties likely to feel interested in the welfare of the minor, whether residing in the county or State, or even in a foreign country. In this respect, his course of procedure is just as undefined by statute and just as discretionary as that of the Court of Chancery ; and once having obtained cognizance of the subject matter by the residence of the minor, and an application for guardianship, his jurisdiction is just as broad as that of the Court of Chancery. In making the appointment, his power and discretion are entirely unlimited, except by such known and established principles as govern the conscience of all courts of equity. It is quite an error to suppose that relatives in another county or State are "beyond the view of the Surrogate." There is nothing in the way of their appointment if they are proper persons and give the requisite security. There is not a word in the statute to sanction such an idea, and every-day practice throughout the State witnesses against it.

It is a great mistake also to suppose that the consent of relatives residing in the county, or indeed of any relatives, is requisite to the appointment of a guardian. The authority of the Surrogate is entirely unlimited in this respect. The relatives have no control in the matter whatever. They have no interest as parties, but receive notice merely to inform the court, so as to make the best appointment for the welfare and interests of the child. For example, in the present case it was entirely competent for the Surrogate to have appointed Frederick Dawson or Robert Lee Dawson guardian, provided

he had been satisfied such course was most beneficial for the infant. The Surrogate also possesses ample power to remove a guardian. Chancellor Kent held that the Court of Chancery alone possessed that jurisdiction (*In the matter of Andrews, an Infant,* 1 *John. C. R.,* 99); but that was nearly forty years ago, and since then the Revised Statutes have clothed the Surrogate substantially with all the power the Court of Chancery formerly possessed. (2 *R. S., p.* 151, § 6).

Nor are the powers of a guardian appointed by the Surrogate limited or restricted by locality more than in the case of any other officer in this State. He is recognized as the lawful guardian throughout the bounds of the State. Of course he cannot, in a strict sense, exercise authority out of this State. But that limitation is not peculiar to a guardian appointed by the Surrogate. In the very nature of things, it appertains not only to all State officers, but also to the courts, which, not possessing extra-territorial jurisdiction, can give no extra-territorial authority. A guardian appointed by a Surrogate is no more a local officer than an executor, administrator, or than a guardian appointed by the Court of Chancery. (*Morrell* vs. *Dickey,* 1 *Johns., C. R.,* 156). In his opinion in Miss Jay's case, the Vice-Chancellor said, "It seems, therefore, that the appointment of Miss Jay to be guardian by the Surrogate of New York, is so strictly local, that she could not, according to the American law, exercise it in the neighboring State of Maryland." That is true, but it does not depend on the fact that the guardian is appointed by the Surrogate, for in making the appointment the Surrogate acts by authority of the People of the State of New York, and the People of New York have no authority in the State of Maryland. Except as connected by the Constitution of the United States, which does not touch at all the civil, domestic government, New York is as much a foreign State relatively to Maryland, as England is relatively to France; and a guardian appointed in New York, no matter by what court, has just as much authority in Maryland, no more, and no less, as a guardian appointed by the Lord Chancellor of

England would have in France. The ground is the same in each case—that the laws of one State have no force or effect, *proprio jure*, in another State. There is no reason, therefore, why the same degree of comity should not be extended to the judicial action of the Surrogates' Courts in the State of New York, that would be extended to any other tribunal of a foreign country in the exercise of its legitimate jurisdiction. The court acts by authority of the People of this State, its jurisdiction is commensurate with that of the late Court of Chancery in the appointment and removal of guardians of minors resident in the county, and its acts are of recognized authority within the limits of the State. What attention is paid to its judicial action beyond the limits of the State, depends entirely, whether in Maryland, France or England, upon the degree of regard had to the comity of nations. "It is established as a principle of international jurisprudence," says Burge, "that effect should be given to the laws of another State whenever the rights of a litigant before its tribunals are derived from or are dependent on those laws, and when such recognition is not prejudicial to its own interests, or the rights of its own subjects." (1 *Burge Com.*, *p.* 5). It may also be safely laid down, that from comity and considerations of mutual interest, foreign States recognize and give effect almost universally to those laws of the domicil which constitute the *status*, quality or capacity of the person, and which place minors under the authority of guardians and tutors, respect being had in this particular to the sentence of the appropriate tribunal in the place of domicil. (*Ibid. pp.* 14, 25).

In the present case there can be no doubt that the domicil of the minor was and is in the city of New York. The place of birth, or the domicil of the father, regulates the domicil of the child. Mary Jay Dawson was born in this city, and her father resided here at the time of her birth, and thence till his decease. This, then, was her domicil of origin. The domicil of origin can be changed only by choice, and the domicil of choice being that which the person himself establishes, it

cannot be acquired by the act of the minor, or by any other person save the father, or the mother being a widow and not having married again. (*Scrimshire* vs. *Scrimshire*, 2 *Hagg. Consist.*, 406.) The domicil of the minor, therefore, had not been changed at the time the case was brought before the Court of Chancery in England. Whether a guardian can change the residence of his ward is not now under consideration. But again, the minor was a native citizen of the United States. By the Common Law she was an alien in England. Says Lord Coke: "Alien, *alienigena*, is derived from the Latin word *alienus*, and according to the etymology of the word, it signifieth one born in a strange country, under the obedience of a strange prince or country (and therefore, Bracton saith that this exception *propter defectum nationis*, should rather be *propter defectum subjectionis*), or as Littleton saith, (which is the surest), out of the liegeance of the king." (*Co. Litt.*, 128, *b*; 1 *Bacon Ab.*, 193, *tit. Alien*; 1 *Com. Dig.*, 552, *Alien*; *Calvin's Case*, 7 *Rep.*, 16 *a*; *Duroure* vs. *Jones*, 4, *Term R.*, 300; *Stanly* vs. *Bernes*, 3 *Hagg.* 373.) "When I say," says Blackstone, "that an alien is one who is born out of the king's dominions, or allegiance, this also must be understood with some restrictions. The *Common Law indeed stood absolutely so*, with only a very few exceptions, so that a particular act of Parliament became necessary after the Restoration, "for the naturalization of children of his Majesty's English subjects, born in foreign countries during the late troubles." And this maxim of the law proceeded upon a general principle, that every man owes natural allegiance where he is born, and cannot owe two such allegiances, or serve two masters at once." (1 *Com.*, 373.) Now it is the doctrine of the English Law that natural born subjects cannot divest themselves of the duty of allegiance which they by natural law owe to the country of their nativity—that this duty is "intrinsic and perpetual." If this duty cannot be divested by the act of a person who has attained full age, much less can it be by a minor, or by persons who have unlawfully obtained the custody of a minor, and taken her from

her native country in defiance of the action of its tribunals of justice. It may be said that by the statutes of 7 *Anne*, *c.* v., § 3, and 4 *Geo. II.*, *ch.* 21, which gave to the children of natural born subjects the rights of an English natural born subject, Mary Jay Dawson is an English subject. But those were enabling statutes—extending privileges, and not establishing coercively a national character. Their phraseology is the same as that of various naturalization acts, which generally declare that the person "shall be deemed, adjudged, and taken to be natural born subjects of this kingdom, to all intents, constructions and purposes whatever." (13 *Geo. II.*, *c.* 7; 20 *Geo. II.*, *c.* 44; 22 *Geo. II.*, *c.* 45; 13 *Geo. II.*, *c.* 25.) The statutes of Anne and Geo. II. differ only from other naturalization acts in respect to the condition on which the privilege is granted. (4 *Geo. II.*, *c.* 21). They are peculiar in attaching the character of British subjects to the native born citizens of other States, without the volition of the subject, and without requiring the condition of residence. If they are to be construed as imperatively determining the *status* of the natives of other countries, coming within their provisions, they conflict with the doctrine of natural allegiance, which, according to the Common Law, " cannot be forfeited, cancelled, or altered by any change of time, place, or circumstance." (*Blackstone Com.*, I., 369, 370.) Thus while it is held that a native of England cannot be expatriated even by his own act, a native of the United States, if found in England, would be claimed as a British subject by virtue of these statutes of naturalization. This is, in other words, the assertion of the right of sovereignty over citizens of the United States born here of an English father, a right which has its inception at the instant of birth, though incapable of exercise unless accident or circumstance place the subject on British soil. There is thus not only a conflict with the English doctrine of natural allegiance, but also with the rights of the American Government—and the local law of England is made to operate upon a native citizen of the United States, simply because he may have placed himself within its power by touching English soil.

It certainly does not increase the strength of this claim that the ward of Miss Jay was removed from the country of her birth clandestinely and in defiance of the authority of the courts of justice. The Lord Chancellor in his judgment says: " If I were called upon now to adjudge on the conduct of Mr. Dawson and Miss Dawson as to what they did when they were in America, I should be very much inclined to say that I think they did not conduct themselves with propriety, because I cannot but feel that they, more or less in a clandestine manner, caused this young lady to be brought from America over to England." Here then was a native born citizen of the United States, admitted to have been clandestinely taken from her home, from her father's and mother's home, in defiance of the mandate of the local tribunals, and of the wishes of her legally constituted guardian—one who by the rule of the Common Law could not put off her natural allegiance, and who being in minority was incompetent to change her domicil—and she, being by the laws of England, that is, by a legal fiction created by act of parliament, *deemed* a British subject, by reason of the nativity of her father, is retained in that country by the sanction of the Court of Chancery, while the guardian appointed by the American tribunal is directed to transmit the income, to be appropriated under the direction of the foreign court. Sir John Stuart, the Vice-Chancellor before whom this case was first brought, approved of a scheme reported by the clerk, to the effect that it would be for the benefit of the infant that "she should not be estranged from her maternal relatives," and that the guardian appointed in New York should be at liberty, when convenient, to remove the infant to New York, "for her residence and education, until the further order of the Court, on security to return and account," &c. This decision was reversed by the Lord Chancellor, who, on coming to the conclusion to retain the minor in England, necessarily declined a recognition, even by comity, of the obligation of the law of the place of her nativity and of her domicil, and of the *forum* where guardianship had been legally determined, before foreign

jurisdiction had been attained.   Under the circumstances attending the removal of the minor from the United States, the guardian was, in my judgment, entirely justified in proceeding to England and making the appropriate appeal, for the restitution of her ward, to the Courts of that country.   The decision which has been rendered could not well be anticipated.   I have no disposition further to consider it than has been necessary to show that I am not called upon by any circumstances properly addressed to judicial discretion, to forego my jurisdiction over the minor, her guardian and her property, and to defer to the judgment of the foreign tribunal. The minor was originally, naturally, and legitimately under the control of our own Courts.   She was covertly carried away in evasion of our laws, and now to reward at once the act and the judgment of the foreign court, by sending her property after her, would be yielding to a spirit of comity, not only where it was not due, but where it had already been unacknowledged.  I must, therefore, direct the allowance of the expenses of the guardian, and refuse to permit the transmission of the funds of the infant abroad.