In re Petition of WILLIAM C. CAMP, for an Accounting by CALVIN B. CAMP, as his Guardian.

*131-253*

*126   377*
*141    28*

Where land in which one has an interest as tenant by the curtesy is sold, the moneys obtained therefor represent the land, and the tenant by the curtesy is, in any event, entitled to interest thereon during his life.

Pending proceedings by a municipality to acquire title to lands belonging to a married woman, for a public improvement, the owner died intestate, leaving C., her husband, and four infant children surviving. C. was appointed guardian of the children, and gave the statutory bond; an award was made for the entire fee of the premises; C. was then in possession; he received the sum awarded, receipting therefor as guardian. In proceedings by one of the children upon his arrival of age for an accounting by his father, as guardian, *held*, that the latter was entitled to a life interest in the fund as tenant by curtesy; that he was not estopped from claiming the same by the fact that he signed the receipt as guardian; that the court had power in the condemnation proceedings to direct the payment of the fund to him without security beyond that given by him as guardian; and that the petitioner had no right to demand immediate payment, when he became of age, of his share of the fund.

It appeared that the father invested and lost the fund in his business, and that he was insolvent. The surrogate computed the value of the life estate in the petitioner's share of the fund, deducted the amount from such share and directed the payment of the balance to him. *Held*, error; that the surrogate had no power to make such an order without the consent of C.; that while the surrogate had power to compel the guardian to account, he could not decree payment to the ward, until by the termination of the life estate he became entitled to the fund, and that, for whatever remedy there might be to secure the safety of the fund, so that it might be forthcoming at the proper time, resort must be had to a court of equity.

A surrogate has no general jurisdiction over a guardian, but simply such as has been specially conferred by statute, together with the incidental powers requisite to carry out that jurisdiction.

The petitioner became of age in 1872; these proceedings were instituted in 1888. *Held*, that the Statute of Limitations was not a bar to the proceedings; that C. having obtained possession of the fund as guardian, dealt with it in that capacity, and not alone in his right as life tenant, and he occupied the position of trustee so far as to prevent the running of the statute; that, although he might cease to be guardian upon the ward coming of age, so long as the property remained in his possession as guardian and unaccounted for, he was liable to account.

(Argued March 11, 1891 ; decided June 2, 1891)

APPEAL by Calvin B. Camp from an order of the General Term of the Supreme Court in the second judicial department, made May 24, 1890, which modified, and as modified, affirmed a decree of the surrogate of Kings county, made upon an accounting by the appellant as guardian of the petitioner, William C. Camp.

From the record it appears that the surrogate of Kings county, on the 16th day of May, 1888, duly issued a citation to Calvin B. Camp, citing him to appear at a Surrogate's Court for the purpose of rendering and settling his account as such guardian. The citation was based upon a petition of William C. Camp, from which it appeared that the petitioner was one of four children of the above named Calvin B. and Mary E. Camp, and that the latter had died intestate in Brooklyn on the 25th of October, 1866, seized of certain real estate, known as No. 138 Columbia Heights in said city, leaving her husband surviving her, and her four children as her heirs at law. Prior to her death proceedings had been commenced by the city to acquire title to the northern portion of the premises above mentioned, and such proceedings resulted after her death in an award of $26,000 to the petitioner and his brother and sisters. The petitioner further showed that the father of the petitioner was appointed his guardian, and also the guardian of his brother and sisters by the surrogate of Kings county on the 17th of February, 1868, they all being at that time under the age of twenty-one years, and that on the 18th of February, 1868, as such guardian, his father received from the city comptroller the above sum of $26,000, and that one-fourth of such sum belonged to the petitioner. The fact of the receipt of such money became for the first time known to the petitioner within a year of the institution of these proceedings to compel an accounting. His father, as such guardian, has never returned or filed an inventory of the property which came into his hands, nor has he ever accounted for or paid over to the petitioner any part of such property.

The guardian appeared on the return day of the citation by his attorney and filed a paper in the form of an objection to

proceeding with the accounting, for the alleged reason that his guardianship of the petitioner ceased in 1872, on the petitioner then becoming of age, and that the present proceedings were on that account barred by the Statute of Limitations. The surrogate overruled the objection and directed the guardian to file his inventory and account, and he put his decision in the form of an order from which an appeal was taken by the guardian to the General Term, which in all respects affirmed the same. Thereupon the surrogate again directed the guardian to file his inventory and account, etc.

In obedience to such order the guardian filed his account, which was of a most general nature, and from which and from his statement accompanying it, it appeared that he had made certain payments which he claimed to charge the petitioner with, and which if allowed would show that he had more than paid out for the benefit of the ward the moneys which he had received. His statement showed that he made no separate investment of the moneys, but had used them with his own in the business in which he was then engaged and in which he lost very heavily and which he was obliged finally for want of funds to wind up and discontinue.

The petitioner filed an objection to such account, because it gave no items of expenditure, charged the guardian with nothing in the way of interest on the moneys, gave no vouchers and failed to comply with the surrogate's order to file an account, while admitting that the entire fund was used by the guardian and lost.

The surrogate referred the account to a referee to hear and determine the questions arising upon the settlement of the account and the exceptions thereto. Before the referee the guardian insisted that by his statement already filed it appeared that the fund of $26,000 was not such a fund as he should account for as general guardian, nor could any portion of it be enforced to be distributed among the heirs at this time or at any time prior to his decease. The objection to proceeding with the accounting was then overruled, and the guardian excepted.

Hearings were then had before the referee and he finally made his report. He found as a fact that the city of Brooklyn

had taken the whole of the lot 136, in the exercise of its right of eminent domain, for public use, and for which an award of $26,000 was made as compensation, and that the sum was paid to Calvin B. Camp, who received it and receipted to the city therefor, adding the word " guardian " to his signature, and that he received the moneys as guardian.

Other facts as to the failure of appellant to file any inventory or to account for any portion of the moneys thus received, and his use of the moneys in his business and his losses therein, were also found by the referee, together with the fact that the guardian was 45 years of age when he received the money in February, 1868.

As a conclusion of law the referee found the guardian liable to account for the amount he received, but that he was entitled to be credited as against that sum with the value of his life interest on the 18th of February, 1868, and the value of such life interest in the share of the petitioner was determined to be, as computed by the Northampton tables and the rules then in force, $3,943. That amount the referee deducted from the share of the petitioner, leaving the guardian liable for the sum of $2,557, with interest thereon from February 18, 1868, which the referee computed with annual rests, and gave judgment for the sum of $9,857.91, with interest from May 15, 1889, the date of his report, besides costs. The surrogate approved and confirmed the report, and judgment was finally entered for $10,244.43 against such guardian. He appealed to the General Term of the Supreme Court. The petitioner also appealed, claiming that the court erred in allowing the guardian the value of an alleged life estate in the moneys he received as guardian. The General Term modified the judgment so as to charge the guardian with the full sum received by him, with interest from the time he recieved it, which amounted in the case of the petitioner to $25,249.14, and to that sum interest was added from September 19, 1889, the date of the decree entered upon the report of the referee as confirmed by the surrogate, together with costs.

Further facts are stated in the opinion.

*William C. Beecher* for appellant. This is not a proper case for an accounting. If any cause of action exists it is for waste by the remaindermen. (*Hatfield* v. *Snedden*, 54 N. Y. 280 ; *Young* v. *Langbien*, 7 Hun, 151, 156.) While it was found by the referee that the appellant was a tenant by the curtesy, and as such was entitled to a life estate in the property involved herein, it is claimed that his interest should be computed on the basis of his probable life at the time of the award, viz., in 1868, notwithstanding the fact that he had already long outlived the then probability of life. This is untenable. (Code Civ. Pro. § 1569 ; 1 Washb. on Real Prop. 165 ; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. 508.) If this were a cause in which the surrogate could have jurisdiction for an accounting, the proceedings are too late. (Code Civ. Pro. § 2847, subd. 1 ; *In re Hawley*, 104 N. Y. 250 ; 2 Kent's Comm. 220 ; *Mendes* v. *Mendes*, 3 Atk. 624 ; *Lane* v. *Farnier*, 11 Lea. 568 ; *Munroe* v. *Phillips*, 65 Ga. 390 ; *Finnell* v. *O'Neal*, 13 Bush, 176 ; *Williams* v. *McLair*, 98 N. C. 332 ; Bushwell on Lim. § 328 ; Angell on Lim. 175, § 178 ; Story's Eq. Juris. § 1520 ; *Butler* v. *Johnson*, 111 N. Y. 204 ; *Smith* v. *Remington*, 42 Barb. 75 ; *McCarter* v. *Campbell*, 1 Barb. Ch. 455, 465 ; *Clark* v. *Ford*, 1 Abb. Ct. App. Dec. 359 ; *Bible Society* v. *Hebard*, 51 Barb. 552 ; *House* v. *Agats*, 3 Redf. 307.) The court below erroneously held that as the guardian was a trustee the statute did not run ; and, that he had withheld knowledge of the facts from his wards. (*In re Neilly*, 95 N. Y. 82.) After over seventeen years' delay the right to invoke equitable relief would have become stale. (*Calhoun* v. *Millard*, 121 N. Y. 69, 81 ; *In re Neilly*, 95 id. 382 ; Perry on Trusts, 869.) The referee erred in excluding the testimony of Mr. Camp offered for the purpose of showing that the equitable title to the property was in him. (2 Washb. on Real Prop. 474 ; *Livingston* v. *Livingston*, 2 Johns. Ch. 537 ; *Melter* v. *Devine*, 20 Barb. 9.)

*Joseph H. Choate* for respondent. The defense of the Statute of Limitations cannot be raised upon this appeal.

(Code Civ. Pro. §§ 1337, 2571.)   The Statute of Limitations is
no defense in this case.   (Code Civ. Pro. §§ 2735, 2847, 2850;
*Seaman* v. *Duryea*, 11 N. Y. 328, 330 ; 2 Story's Eq. Juris.
§§ 1338, 2830, 2837, 2842, 2844, 2845, 2849 ; *Robison* v.
*Robison*, 5 Lans. 169; 2 Perry on Trusts, 863; *Reitz* v. *Reitz*,
80 N. Y. 542; *Thomas* v. *Bennett*, 56 Barb. 197; *Mabie* v.
*Bailey*, 95 N. Y. 206; *Boughton* v. *Flint*, 74 id. 476 ; *Ber-
tine* v. *Varian*, 1 Edw. Ch. 347.)   The decision of the General
Term in modifying the surrogate's decree, by disallowing the
credit or offset allowed by the referee and granting a decree
for the full amount claimed by the petitioner, was clearly right
and must be affirmed.   (*Scholey* v. *Halsey*, 72 N. Y. 583;
2 Perry on Trusts, 510, § 863 ; Code Civ. Pro. § 2587;
*Schenck* v. *Dart*, 22 N. Y. 421 ; *In re Kellogg*, 104 id. 651.)
If this court shall for any reason decide that the General
Term erred in modifying the decree entered upon the referee's
report, that decree must at least be affirmed.   (1 Story's Eq.
Juris. § 488 ; Redf. Surr. Pr. [2d ed.] 511 ; *Cook* v. *Lowry*,
95 N. Y. 113; *Hannahs* v. *Hannahs*, 69 id. 611.)

PECKHAM, J.   It is important at the outset to determine the
precise ownership of the fund of $26,000 received by the
appellant from the city of Brooklyn.   He claims a life interest
as tenant by the curtesy, while the petitioner asserts that what-
ever right the appellant may have had in the real estate the
specific fund in question represents solely the interest of the
four children as heirs in such property, and he says that
the appellant had no right or title to it excepting as guardian
of his infant children.

The referee has found that the appellant had an interest in
the fund as tenant by the curtesy, and the petitioner objects to
such finding as having no evidence to support it.

I think there is evidence to uphold the finding and it, there-
fore, becomes conclusive on us.   The receipt given by the
guardian to the city, when the money was received, shows that
it was for land taken for Brooklyn Heights improvement, and
that it was paid to Calvin B. Camp, guardian.   Mr. Camp

swore on the hearing before the referee that during the year 1866 condemnation proceedings were instituted by the city to condemn the property in question, and that the sum of $26,000 was received by him and it was paid for property that the city took for the purpose of the Brooklyn Heights improvement; that he was in possession of the property when it was taken and the title to it stood in his wife's name, and the sum paid was the identical sum of money paid as damages for taking the lot or premises in question. This I think clearly shows that the sum paid was for the whole interest in the property, and at any rate the evidence is sufficient to permit such an inference, and the referee has drawn it. I think there is no doubt that this is the real truth of the case. The fact that the appellant signed, as guardian, the receipt which he gave to the city authorities, does not estop him from showing the truth as to his personal interest in the fund thus paid to him. No one has been deceived by such signature as to the rights which the appellant had in such fund.

This finding of the referee is not affected by anything in the act for the improvement of Brooklyn Heights, or in that consolidating the cities of Brooklyn, Williamsburgh, etc., referred to in the record. They provide for the payment to the parties entitled of the amount of the awards made for the taking of their interests, but the clear inference to be drawn from the evidence in this case sustains the finding of the referee that this award was for the entire fee in these premises. There can really be no reasonable doubt of the correctness of this finding. The fund, under such facts, would represent the real estate for which it was paid and the rights of the several parties in and to the real estate would be the measure of their rights to the fund representing it. This real estate was owned by Mrs. Camp at the time of her death, but proceedings were instituted to condemn it prior to that event.

But for such proceedings the appellant would have taken the real estate in question for life, as tenant by the curtesy, and as such would have been entitled to its possession and to the receipt of the rents and profits. (*Hatfield* v. *Sneden*, 54

N. Y. 280; approved in *Bertles* v. *Nunan*, 92 id. 152, at 160, per Earl, J.)

Where land in which one has an estate as tenant by the curtesy is sold, the moneys obtained for the purchase represent the land, and the tenant by the curtesy is in any event entitled to interest thereon for his life. (*Sweetapple* v. *Bindon*, 2 Vern. 536; *Cunningham* v. *Moody*, 1 Ves., Sr., 174–177; *Dodson* v. *Hay*, 3 Brown Ch. 405; *Dunscomb* v. *Dunscomb*, 1 Johns. Ch. 508.)

In *Cunningham* v. *Moody* and *Dodson* v. *Hay* (*supra*), the principal of the sums in which the parties had an interest as tenants by the curtesy seems to have been paid to them without question as to their rights, while in *Sweetapple* v. *Bindon* and *Dunscomb* v. *Dunscomb* (*supra*), the parties themselves asked that the principal sum be invested and the interest only be paid them for life.

There can be no doubt that the appellant was at least entitled to the use of this fund for life, either in the shape of an investment by others and the payment of the interest thereon to him during that time, or else in the shape of the payment of the principal of the fund to him (with or without the exaction of security), and with a right on his part to the interest thereon during his life.

At the time when the money was paid by the city, the fund was in truth under the control of the court in the condemnation proceedings. It was raised for the purpose of paying for the property taken by such proceedings, and the court might, as it seems to us, on the application of the city or of the father of these infants, have made an order providing for the payment of the fund to the father, with or without his giving security for its safe keeping during his life, or providing for its investment and the payment of the interest thereon to him for the term of his life. This might have been done under the general power of a court of equity to order a tenant for life of a personal estate before its delivery to him, to give security for its forthcoming, or else to provide for the investment of the fund and for the payment of interest only to him

during his life. (*Covenhoven* v. *Shuler*, 2 Pai. 122–132; *Tyson* v. *Blake*, 22 N. Y. 558; *Smith* v. *Van Ostrand*, 64 id. 278–281; *Livingston* v. *Murray*, 68 id. 485.)

But generally, before making an order for such security, there must be some fact alleged and proved tending to show the property would be unsafe and insecure in the hands of the tenant for life. (1 Sto. Eq. Jur. § 604 & note; *Hudson* v. *Wadsworth*, 8 Conn. 348; *Langworthy* v. *Chadwick*, 13 id. 42; *Clarke* v. *Terry*, 34 id. 176.)

However, instead of resorting to the power of the court in the very proceeding in which the fund arose, it would seem that another course was taken. The only testimony upon the subject is that of the appellant himself, and he is very vague, saying at one time that he signed the receipt for the money as guardian at the instance, as he supposed, of the supervisor or comptroller, but on further examination he admitted he did not remember at whose instance he signed it. The record shows the appointment by the surrogate of Kings county of the appellant as guardian upon his own petition, and the approval of his bond on the seventeenth of February, and the payment of the money to him on the 18th of February, 1868, as guardian. The corpus or principal of the fund did not belong to the appellant as owner, and it is also true that the right to the use of it did so belong to him during his life, while the right to the actual custody of the fund was subject to the regulation and control of the court. When, therefore, the appellant as guardian received the fund, for the forthcoming of which he gave security, he took it subject to his individual right to the use of the same for his own life.

It was entirely right to give the receipt as guardian, for we must assume it was as guardian that he received the fund, but that does not conclusively determine the rights of the respective parties in it. Suppose some other person had been appointed guardian upon these same facts, the father having the right to the use of the fund for life. Would the receipt of the fund by the guardian affect the right of the life tenant to its use, or give to the ward any greater interest therein than the right to

receive the corpus of the fund from the guardian upon the death of the .life tenant? The fault of the reasoning of the petitioner is, it seems to me, in the claim that because the appellant received this fund as guardian, therefore, it necessarily follows that, upon the coming of age of the ward, the latter is entitled to the immediate delivery of the fund to him. This does not at all follow, nor does its denial in any degree tend to the changing of the character in which the appellant received the fund.

· The facts show that the fund he received was subject to the right of the tenant for life to use it during his life, and that right is not subject to the right of the ward when he comes of age to demand the immediate delivery of the fund to him. ·

The truth is, the claim of the petitioner to an immediate payment to him of the corpus of this fund is based upon no principle, when the facts of the case are considered. The right of the appellant to the use of this fund for life cannot be successfully. controverted. He did not lose that right by admitting the receipt of the fund as guardian of the infant heirs. They did own the corpus, and their title was not increased nor their right enlarged by the appellant admitting that he received, and by receiving, the fund as guardian. Upon this question of title and right, it may be assumed the fund still remains intact in the appellant's hands. What has the appellant done to forfeit the use of the fund for his life? And what right would the petitioner have to demand its payment to him because he had arrived at the age of twenty-one years? It all hinges upon the effect to be given to the appointment of the appellant as guardian and his admission that he received the fund as guardian. I cannot see in those facts anything inconsistent with the right of the appellant to the use of the fund for life. Of course when the ward became of age he was entitled to an account as between himself and the appellant, his guardian, but the right to demand payment of the corpus to him does not necessarily follow and attend upon the recognition of the right to call the guardian to account. While a court of equity may impose upon a tenant for life of personal property, as a

condition of the delivery of the property to him, that he shall give security, it does not at the same time authorize the the remainderman to claim the payment to him of the fund in which another has a life estate, upon his giving security to the tenant for life that he will be paid the interest on the fund as long as he lives.

It may very well be that the guardian would not have obtained the possession of the fund in his character of mere life tenant without giving security for its forthcoming at the proper time. But by being appointed guardian, his right as life tenant is not reduced, and by giving security he obtains possession of the fund, the use of which for life he is entitled to and the production of which at the proper time (to wit, the expiration of his life estate) he has given security for. Hence when the ward becomes of age he has no right to demand from his guardian the immediate payment to him of a fund which the guardian holds under such circumstances. In such case the accounting takes place as an ordinary one for all purposes of stating the account between the parties, but the order does not provide for an immediate payment to the ward of the corpus of any fund held by the guardian subject to his own or some other person's right to a life interest therein.

It appears in this record that when the appellant was appointed guardian he gave the bond provided for by statute, and we must in the absence of the bond assume that it provided security for the faithful discharge of the trust reposed in him and for obedience to all the lawful directions of the surrogate, and for the rendering of a just and true account of the property received by him, and of the application thereof. There is, therefore, proper security for the ultimate payment to the ward of the corpus of this property when it becomes payable to him by the death of the tenant for life. The interest on such corpus during the life of the life tenant, the ward has never been and is not now entitled to.

It appears, however, that the appellant has in truth lost the fund which he received and that he is unable to repay the same, having used it in his business in which he lost heavily and

which he was finally compelled to abandon, and the appellant may probably fairly be regarded as an insolvent.

What order may be made in such a case depends upon the question of the extent of the jurisdiction of the surrogate, which I shall discuss later on.

Holding as we do that the appellant had a life estate in the fund, we do not know of any power in the referee or the surrogate to compute its value and deduct the gross sum arrived at from the amount of the original fund. The appellant has never consented to any such computation and deduction, and there is no statute that we are aware of which vests the right in the court to compel him to consent. Without his consent and in the absence of such statute it cannot be done. It may be that on the accounting hereafter it may appear that there are some valid charges against the portion of the fund eventually coming to the petitioner. His proportionate share in the necessary legal expenses incurred in maintaining against the opposition of the city a right to an award from the city for the property taken, would seem to be a proper charge against the fund. Also the amount paid by the guardian in compromise of a judgment against the ward after he became of age and at his request. If the facts should appear as claimed it would look as if these were proper charges. We do not, however, decide the questions, as they may again arise upon the accounting and upon possibly a different state of facts.

Hitherto it has been assumed that the right to demand an accounting was entirely clear. The appellant claims, however, that the Statute of Limitations is a bar, as the ward became of age in 1872, and these proceedings were not instituted until 1888. He says there is no trust in the relationship of guardian and ward, and that there can be no guardian to one who has arrived at his majority, and that from such moment the right which the former ward holds is simply one to call the guardian to account, which right ceases at the most in ten years, and he cites the case of *The Matter of Hawley* (104 N. Y. 250), as authority for his position.

That case does hold that one who is appointed a testamentary

guardian is not a trustee within the meaning of the statute applicable to accountings of testamentary trustees, even though the will designate him as a "guardian and trustee," provided the will creates no trust. In the course of his opinion, RAPALLO, J., said that in order to constitute a testamentary trustee, it was necessary that some express trust should be created by the will, and that, although every guardian was in a general sense a trustee, as he deals with the property of others confided to his care, yet he was not such in the sense in which that term was used in courts of equity and in the statutes.

Some judges have rested the foundation of the jurisdiction of chancery over guardians upon this very doctrine of trusts. (*Duke of Beaufort* v. *Berty*, 1 P. Wms. 702 ; *Wellesley* v. *Wellesley*, 2 Bligh. N. R. 124, per Lord REDESDALE.) They were cases of personal trust relating to the proper custody of the infants, and it is claimed that the trusts spoken of in equity are applied only to property and especially to real property, and not to persons. (2 Sto. Eq. Jur. § 1330.) The power is also referred to the general power of the crown or of the state as *parens patriæ*, to care for infants. (Id. § 1332, note 6, etc.)

But I do not regard the matter as very important upon this question. The guardian has obtained possession of the fund as guardian, and he deals with it, not alone in his own right as life tenant in this case, but he also deals with it as the property of others confided to his care. In this sense he occupies the position of a trustee so far as to prevent the running of any Statute of Limitation in his favor regarding the property entrusted to him. Although he may cease to be guardian upon the ward coming of age, yet so long as the property remains in his possession as guardian and unaccounted for, he must remain liable to account. This is no hardship upon the guardian, nor can it be the means of sustaining stale claims against him as such. The moment the ward arrives of age he may cite the guardian to account, and now by the Code of Civil Procedure (§ 2849, following the provisions of the Revised Statutes, vol. 2, p. 152, § 12), the guardian may, in any case where a petition for an accounting may be presented

by any other person, present one in his own behalf, and an accounting may then be had. Thus either party may claim an accounting the moment the ward attains his majority.

The last question arises upon the nature of the jurisdiction of the surrogate, based upon the fact that the appellant has lost the fund which was paid to him. Does that fact make any difference in the power of the surrogate over the subject? If the fund were safe and in the hands of the appellant, we hold that on the accounting the surrogate could not make any order for its payment by the appellant to the petitioner or any other person. Upon the authority of *Seaman* v. *Duryea* (11 N. Y. 324), it is settled that the power of the surrogate to compel a guardian to account is not limited to determining the balance remaining in the hands of the guardian, but he may decree that the guardian pay over such balance to another guardian appointed in his stead or to the ward if he has attained his majority. Of course, this refers to a case where the ward is entitled to immediate payment of such fund. It can have no application to a case like this, where the ward is not yet entitled to payment. The surrogate has no power in such case to decree the payment by the guardian to the ward, even if the fund remained in the guardian's hands, and it is difficult to see how he obtains any greater right in the case because it appears that the guardian has lost the money. Having no right to order its payment to the ward if the guardian still had it, no such power arises from the fact that the guardian has it not. The surrogate exercises only such jurisdiction as has been specially conferred by statute, together with those incidental powers which may be requisite to carry out such jurisdiction. (*Riggs* v. *Cragg*, 89 N. Y. 489; *Matter of Underhill*, 117 id. 471.)

Section 2821 of the Code gives the same authority to surrogates to appoint guardians which the chancellor had December 31, 1846, and sections 2847 *et seq.*, give the authority to a surrogate to compel a guardian thus appointed to account. Payment in a proper case is part of an accounting, and where a surrogate has power to order an accounting he has power to

decree a payment of whatever sum is found due and then payable to the ward.   But the difficulty here is that the ward is not entitled to payment at present, and an order in regard to the fund, directing its payment to some third party or into court, would not be one which naturally grows out of a power to direct an accounting, but could rest only upon a power to see that a fund, once rightfully in the hands of a guardian and lost by him, should be in some way made good before the time arrived when it would become payable to the ward and during the time when the use of it would belong to the party who had in truth lost it.   I do not think this power comes under any legitimate exercise of the power to decree an accounting. The surrogate has no general jurisdiction over a guardian as a trustee.   That power remains in the Court of Chancery or in its successor the Supreme Court.   (*In re Andrews*, an infant, 1 Johns. Ch. 99.)

The surrogate has power now to decree the accounting and to take and state the account, but for whatever remedy there may be in regard to an enforcement of the present liability for the safety of the fund so that it shall be forthcoming at the proper time, resort must be had to a court of equity.

What remedy a court of equity could furnish is a question not now before us.   It might be claimed that it has the same power it would have had if the money had been paid over under its order to the life tenant upon his giving the required security that it should be forthcoming when properly payable at his decease.   The life tenant having thus obtained possession of the fund for his life and the security being sufficient, has the court, upon proof made that he has lost the fund and is insolvent, power to order its repayment into court and to enforce such order by process of contempt, or is the security which was exacted when the money was paid over the only source of indemnity for the loss?   If so, could it be resorted to on proof of the loss and the insolvency of the life tenant, or must the remedy upon the bond be postponed until the death of the life tenant?   In other words, would proof of the loss and the insolvency of the life tenant be regarded as a

present breach of the condition of the bond? Lord HARD-WICKE, Lord Chancellor, said a court of equity would decree a legatee to refund his legacy in order to allow the payment of a debt due from the estate. (*Hawkins* v. *Day,* Ambler, 1160.) This was not based upon any statute, but upon the inherent power of a court of equity having general jurisdiction over the subject-matter to see to it that justice was done. These questions do not arise here and we are not only not called upon, but it would be useless for us to give an opinion thereon in advance of their presentation. I only allude to the matter to show that while they are novel, important and not easy of solution, the question immediately before us has not been decided without consideration of the possible consequences which may flow from our decision.

The result is that the order of the General Term and the decree of the surrogate must be reversed, with costs, and the accounting of the appellant must be proceeded with in conformity with the views herein expressed.

All concur.

Ordered accordingly.