(75 Misc. Rep. 419.)

## In re WAGNER.

(Surrogate's Court, New York County. January, 1912.)

1. ALIENS (§ 70*)—NATURALIZATION—CONCLUSIVENESS OF JUDGMENT.
    A proceeding in which an alien is naturalized cannot be questioned collaterally.
    - [Ed. Note.—For other cases, see Aliens, Cent. Dig. §§ 146, 151, 154–160; Dec. Dig. § 70.*]

2. GUARDIAN AND WARD (§ 8*)—APPOINTMENT OF GUARDIAN—JURISDICTION.
    The power of the surrogate to nominate and appoint guardians for infants flows from Code Civ. Proc. §§ 2472, 2821, 2827, and is not affected either by the decree of a German court in a divorce proceeding between the child's parents or by an agreement or convention between the parents without the approval of the surrogate.
    [Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 9, 13–18; Dec. Dig. § 8.*]

3. GUARDIAN AND WARD (§ 5*)—GUARDIAN IN SOCAGE—STATUTORY PROVISION.
    Where an infant holds no real property, so that there is no guardian

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in socage, Domestic Relations Law (Consol. Laws 1909, c. 14) § 80, is not applicable.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. § 6.; Dec. Dig. § 5.*]

4. GUARDIAN AND WARD (§ 11*) — APPOINTMENT OF GUARDIAN — STATUTORY PROVISION.

Domestic Relations Law (Consol. Laws 1909, c. 14) § 81, providing that a married woman is a joint guardian of her children with her husband, with equal powers, rights, and duties in regard to them, relates to testamentary guardianship only.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 34–39; Dec. Dig. § 11.*]

5. GUARDIAN AND WARD (§ 10*) — APPOINTMENT OF GUARDIAN — "MARRIED WOMAN."

In Domestic Relations Law (Consol. Laws 1909, c. 14) § 81, providing that a married woman is a joint guardian of her children with her husband, the term "married woman" does not refer to one married to another than the living father of the child after divorce from him, but only to the mother married to the father of the infant.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 23–33; Dec. Dig. § 10.*

For other definitions, see Words and Phrases, vol. 5, p. 4400.]

6. GUARDIAN AND WARD (§ 13*) — APPOINTMENT OF GUARDIAN — POWER OF SURROGATE.

Under Code Civ. Proc. § 2821, providing that the Surrogate's Court has the like power to appoint a general guardian of an infant which the chancellor had on December 31, 1846, the best interest of the child is the first consideration in the surrogate's selection of a guardian for an infant.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 40–52; Dec. Dig. § 13.*]

7. GUARDIAN AND WARD (§ 10*)—APPOINTMENT OF GUARDIAN—PERSONS ENTITLED.

Where a father who applies to be appointed guardian of his five year old daughter, who is maintained and wholly supported by him in the city of New York where both reside, while he was a naturalized citizen of the United States, was married to the mother of the child, and by a decree of divorce granted by a court of competent jurisdiction in the German Empire for the adultery of both parties no formal award was made of the custody of the child, and the mother is now the wife of an alien, the surrogate will appoint the father alone as guardian, providing in the order for some access to the infant on the part of the mother.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 23–33; Dec. Dig. § 10.*]

8. GUARDIAN AND WARD (§ 10*)—APPOINTMENT OF GUARDIAN—PERSONS ENTITLED.

That the father of a child is a divorced person is not an insuperable objection to his appointment as her guardian.

[Ed. Note.—For other cases, see Guardian and Ward, Cent. Dig. §§ 23–33; Dec. Dig. § 10.*]

Application for the appointment of a guardian of the person and property of Ruth Wagner, an infant. Granted.

Holm, Whitlock & Scarff, for petitioner.
A. L. & S. F. Jacobs, for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

FOWLER, S. This matter comes before the surrogate on the petition of the father, Otto Wagner, to be appointed the guardian of the person and property of Ruth Wagner, an infant, aged five years on August 23, 1910. The application is resisted by the mother of the infant, now the wife of Mr. Ottmar Begas, a German citizen, to whom she was married while temporarily at Hoboken, N. J., on December 5, 1910. Mr. Begas is a citizen of Germany, but both Mr. and Mrs. Begas at present are domiciled at Capri, in the Bay of Naples, Italy. .

The petitioner, the father of the infant, was born in the Republic of Mexico in the year 1868, but obviously of parents who were either of German origin or German extraction. On the 12th day of March, 1900, pursuant to the act of Congress in such cases made and provided, the petitioner, Otto Wagner, was admitted to be a citizen of the United States of America, and he now is, by virtue of a decree of naturalization, a citizen of the United States. He is at present domiciled in our county of New York, and resides at present with the infant at the Hotel Majestic, Central Park West, in the city of New York, in the aforesaid county.

It appears from the voluminous papers before me that on October 27; 1903, the petitioner, Otto Wagner, was married at Wiemar, Germany, to Marie Trautvetter, the respondent, described as the daughter of the grand forester of Wiemar. Thereafter Mr. and Mrs. Wagner traveled in Europe until the year 1904, when they went to Mexico, where they remained until March, 1906. In 1905 this infant was born in Mexico. In 1906 Mr. and Mrs. Wagner returned to Wiemar, and, after a little, again traveled over various parts of Europe until January, 1908, when they returned to Mexico. In October, 1908, Mr. and Mrs. Wagner again returned to Germany. In 1909, while Mrs. Wagner remained in Germany with the infant, Mr. Wagner visited New York and Mexico, returning in May of the same year to Berlin, Germany. On May 5, 1910, Mr. and Mrs. Wagner were divorced by a final judgment or decree of the Royal·State Court, No. 3, of the Kingdom of Prussia, Empire of Germany, for a grave dereliction of both husband and wife, or, as frankly stated in the respondent's own affidavit submitted to me, for the adultery "of both of us." This is admitted by Mr. Wagner, the petitioner. That both parties to the divorce were before the German tribunal in the divorce proceeding is admitted. That no formal award or custody of the infant was made by the German court in any proceeding is also apparent from the papers before me.

[1] That the German decree or judgment of divorce recites that petitioner, Otto Wagner, was a citizen of Germany, is charged by the respondent; but, in effect, this allegation is traversed or explained by the petitioner as a default on his part. No duly authenticated copy of the decree is, however, before me, and I cannot know definitely whether or not such decree so recites. I am, however, bound by the action of the United States of America in respect of the status of the said Otto Wagner. He is now before me as a citizen of the United States, and as such citizen only is he to be regarded in this tribunal

for all the purposes of this proceeding. I cannot question collaterally, or at all, the acts of my own government. That he is at present domiciled in New York with the infant is not denied.

After the divorce of her parents it appears that the infant (in whom alone I am interested in this proceeding, as her citizenship clearly follows that of her father, and she now resides in my jurisdiction and is committed to my care) was taken by the father from Germany via New York to Mexico. In July, 1910, the child was brought thence to New York. In November, 1910, as I am informed by the papers submitted to me, a writ of habeas corpus issued out of the Supreme Court of this state, at the instance of the mother, directing the father, Otto Wagner, to produce the infant before the court for its further action. Pending this proceeding the father and mother entered into some sort of convention in writing, dated November 30, 1910, providing for the future custody, maintenance, support, and education of the infant. Thereupon the writ of habeas corpus in question seems to have fallen without further action of the court. The father then took the infant to Berlin, Germany, in December, 1910, apparently pursuant to the agreement mentioned. Both parties now allege ultimate breaches of the said agreement. Which is in the right I cannot determine, and, according to my view of the status of the child, it is of no consequence in this proceeding before me. In any event, the infant was brought back to New York almost immediately by the father, and since January, 1911, has been continuously in the county of my jurisdiction. Thereafter the mother procured to be issued out of the Supreme Court of this state a second writ of habeas corpus directed to the father and requiring the production of the child. This writ also was allowed to lapse without further action of the Supreme Court.

In March, 1911, the father began this proceeding now before me to be appointed guardian of the infant. I have heard at various times the arguments of counsel for the father and the mother. The papers submitted to me contain in great detail much irrelevant matter, if my view of the law is correct. Charges of breach of faith and of the written convention or agreement between the husband and wife are alleged and denied at great length. The countercharges against Mr. and Mrs. Begas I shall not consider, as my decision does not turn upon any such matter. I shall assume in the abstract that, according to the modern standard for a matrimonial status, Mrs. Begas may well claim to be the coguardian of her infant child, if there is no other disability than her divorce and remarriage.

[2] Whether the father and the mother could or could not provide for the custody and control of the infant by a written compact inter se, I take it that their convention is not in any event binding on me in this proceeding if, as I think, I have jurisdiction of this infant and of this proceeding. Nor can I consider in this proceeding the rights of the father and the mother under the German law; although the present status of Mr. Wagner and Mrs. Begas personally in respect to their prior act of marriage in Germany may be regarded as fixed by the German divorce. The infant is now in my custody, or in cus-

todia legis, as it were, for all the purposes of the application before me. I am, however, favored by the opinion of a German jurisconsult, the Herr Dr. E. Zitelmann, that by the German law my jurisdiction over the infant is complete, and that the status of the child was not before the German tribunal in the course of the divorce proceeding in Germany or otherwise. But quite irrespective of such opinion, it is apparent that the infant was not before the German court, and that if the infant is now a citizen of the United States, residing in this country, any decree of a German court could have no extraterritorial effect, nor could it determine for me the status of the infant in my own jurisdiction. But it is not pretended that the status of the infant was so fixed by such decree of the German court. Nor do I think for an instant that the agreement or convention between the parents of the infant, without my sanction or approval, could fix the status of the infant in view of the powers committed to the surrogate by section 2821, Code of Civil Procedure. Cf. Kearney v. Brooklyn Industrial School, 1 Redf. Sur. 292. Thus both the German decree divorcing the parents and the convention between them are out of the case.

The relevant facts submitted to me on this application are, as I conceive, the following: A citizen of the United States, residing and domiciled within this county, applies to the surrogate to be appointed the guardian of the person and estate of his infant daughter, under 14 years of age. The infant resides at present with the father in this county. The mother of the infant resists the application. The mother and the father of the infant were lawfully married in the German Empire, pursuant to the laws of that empire, and were subsequently divorced by a competent tribunal of the same empire in a proceeding in which both the spouses appeared, and duly submitted themselves to the jurisdiction of the German tribunal. That the decree of divorce was based on proofs of the adultery of both parties, as the German law, or the lex fori, tolerates absolute divorce under, to us, such unusual circumstances. The regularity of the decree is not challenged. The mother of the infant was subsequently, but before this proceeding, married to Mr. Ottmar Begas, a German citizen, and she is now domiciled with Mr. Begas at Capri, in the Kingdom of Italy. Her present nationality follows that of Mr. Begas. It is also a relevant circumstance in this proceeding that the infant is maintained and supported wholly by the father in comfort, and that the father is a man of large fortune, amply able to provide for the infant. The mother's circumstances, on the other hand, are conceded to be inadequate. The estate of the infant consists of several thousands of dollars derived from some source not disclosed, but apparently on deposit in the infant's name in this county of New York. Such estate is wholly inadequate for the support, maintenance, and education of the infant. The surrogate's power to nominate and appoint guardians for infants flows from sections 2472, 2821, and 2827, Code of Civil Procedure.

[3] As it is not pretended that the infant holds any real property, there is no guardian in socage, under section 80, Domestic Relations Law, and that section, therefore, is out of this case.

The first contention in behalf of the mother of the infant is that

by the German law she is, at this stage of its existence, the guardian of the infant. If this be true, the German law, for the reasons already stated, has no controlling influence on this application to me. The infant is now a ward of this court, and not a ward of the German court. Her property and person are in my jurisdiction alone.

[4] The second contention in behalf of the mother is that under section 81, Domestic Relations Law, she is the "joint guardian" of the infant "with her husband, with equal powers, rights and duties in regard to it." This section, in my opinion, relates to testamentary guardianship only.

[5] But if section 81, Domestic Relations Law, is applicable to this proceeding, as intimated by my predecessor in Matter of Drowne, 56 Misc. Rep. 417, 107 N. Y. Supp. 1029, although I think my construction that it is not so applicable is indirectly supported by the dictum in Goodman v. Alexander, 165 N. Y. 289, 59 N. E. 145, 55 L. R. A. 781, why even then I am of the opinion that the term "married women" in that section intends a mother married to the father of an infant. As to such father the mother has ceased to be the "married woman" intended in the statute. The statute does not refer to a woman married to some one other than the living father of the infant. I had very lately section 81, Domestic Relations Law, under consideration in Matter of Scoville, 72 Misc. Rep. 311, 313, 131 N. Y. Supp. 205, and the development of that section is there given as I hope accurately. Cf. chapter IX, Macpherson on Infants. I am aware of no case in this state where that section has been held to apply after the divorce of the parents. Since St. 12 Car. II, c. 24, long since re-enacted in New York (Matter of Scoville, supra), the construction of that section has been uniform, and, while as at present displayed on our statute book the operation of the original statute (12 Car. II, c. 24) has been somewhat enlarged, the construction has not varied materially. To hold that that statute, even as amended, now defines all the rights of parents of infants to the guardianship of infants, would, I believe, be a perversion of the intent and scope of the statute itself.

By the process of elimination we have now disposed of the respondent's invocation of the German law, and of the written convention or agreement of the parents, and also of the claim of the mother, under our statute, to be the rightful and joint guardian of her infant. We may now proceed to consider the application unaffected by those extraneous circumstances.

[6] We come next to the consideration of the power of the Surrogate's Court to appoint a guardian for this infant. Upon this point the statute is clear. Code Civ. Proc. §§ 2472, 2821. It is now declared that:

"The Surrogate's Court has the like power and authority to appoint a general guardian, of the person or of the property, or both, of an infant, which the chancellor had, on the thirty-first day of December, 1846." 2 R. S. 151, § 6, now Code Civ. Proc. § 2821.

The substance of this statute is as old as the year 1802. The present phraseology is more modern and intended to furnish a recognized

standard by which the selection of the guardian shall be thenceforth determined by the surrogates. Before 1802 the surrogate had no jurisdiction to appoint guardians, except, possibly, guardians ad litem. Their jurisdiction was statutory. 1 R. L. 454, § 30; 2 R. S. 151. The ecclesiastical courts had no such jurisdiction. Bingham, Infancy, 168; Shelf. Mar. & Div. 677. Macpherson (Ed. 1843) in his treatise on Infants is very instructive on the jurisdiction of the ecclesiastical courts to appoint guardians for infants. Chapter VI. It was Lord Hardwicke who put an end to any such pretense in the ecclesiastical courts. The power and authority of the surrogate to appoint guardians under the statute is and was originally a power of nomination and selection, rather than a power of subsequent control, coextensive with that of the last of the chancellors. Matter of Andrews, 1 Johns. Ch. 99; Matter of Camp, 126 N. Y. 377, 391, 27 N. E. 799; Matter of Bolton, 159 N. Y. 129, 135, 137, 53 N. E. 756.

Having reference to the construction of the statute regulating the power of the surrogate over guardians, it is apparent that the nomination and appointment by the surrogate of guardians for infants must not depart from the canons binding on the last of the chancellors of this state, and so I construe it; for otherwise the reference in the statute to the chancery would have no meaning at all. In other words, the selection of the person to be appointed guardian by the surrogate is now governed by the former practice in equity, and it is certainly a safe criterion. White v. Pomeroy, 7 Barb. 640, 642; Cozine v. Horn, 1 Bradf. Sur. 148. The origin of the power of the chancellor to appoint guardians for infants has long been the subject of much learned discussion. Mr. Hargrave in his notes to Coke on Littleton, Mr. Fonblanque, and other eminent English lawyers of the past have paid special attention to this subject, with the result that the rules relative to the nomination of guardians had become, by the time of the Revised Statutes, practically a closed canon in courts of equity. 2 Kent, Com. 226. This fact would account for the limitation now contained in the New York statute conferring on the surrogate the power of appointing guardians for infants subject to the former canons of the Court of Chancery.

By the standard thus prescribed, the best interest of the child is to be the first consideration in the surrogate's selection of a guardian for an infant (Bennett v. Byrne, 2 Barb. Ch. 216, 219; People v. Wilcox, 22 Barb. 178, 183; Matter of Watson, 10 Abb. N. C. 215; Matter of Welch, 74 N. Y. 299), and such is the rule recognized in the Surrogate's Court (Ex parte Dawson, 3 Bradf. Sur. 130, 133; Matter of Burdick, 41 Misc. Rep. 346, 84 N. Y. Supp. 932; Matter of Jacquet, 40 Misc. Rep. 575, 82 N. Y. Supp. 986).

It should not be overlooked that the infant in this matter is now maintained and supported wholly by the father, from whom she has a right to expect a substantial fortune, if she survive, and remain with him, and a dowry with provision meanwhile. This fact is not to be disregarded by the surrogate in the infant's best interest. Should the father for any reason fail to continue his interest in the infant and his care and support, it would be a great misfortune to her, and, if he

were to abandon her, possibly an expense to this county, for its remedy over against the father might prove unavailing. It speaks well for the father that even the mother apparently entertains no apprehension of the father's neglect to support and maintain the infant in a condition appropriate to her station in life.

There can be no doubt, I think, that the surrogate may still appoint other than the parents of the infant as her guardian (Code Civ. Proc. § 2821; Holley v. Chamberlain, 1 Redf. Sur. 333; Matter of Jacquet, 40 Misc. Rep. 575, 82 N. Y. Supp. 986; Matter of Tully, 54 Misc. Rep. 184, 105 N. Y. Supp. 858; Foster v. Mott, 3 Bradf. Sur. 409; Matter of Meech, 7 N. Y. Supp. 257; Matter of Raborg, 3 N. Y. St. Repr. 323, affirming Rollins, S.; Johnson v. Borden, 4 Dem. Sur. 36; Matter of Watson, 10 Abb. N. C. 215; Matter of Vandewater, 115 N.Y. 669, 22 N. E. 174; Matter of Buckler, 96 App. Div. 397, 80 N. Y. Supp. 206), although in a normal case the claim of the parents may still be paramount (Matter of Barre, 5 Redf. Sur. 64). I do not believe that a mere declaration in the statute (Dom. Rel. Law, § 81) of this state, perpetuating a power of designating testamentary trustees and re-enacting St. 12 Car. II, c. 24, with amendments (now Dom. Rel. Law, § 81), had the radical effect of altering the power of the surrogate to appoint other than the parents such guardians. Goodman v. Alexander, 165 N. Y. 289, 291, 292, 59 N. E. 145, 55 L. R. A. 781. Whatever the effect of section 80, Domestic Relations Law, may be on the rights of the father and mother inter se to be appointed guardians (cf. Matter of Watson, 10 Abb. N. C. 215; Matter of Drowne, 56 Misc. Rep. 417, 107 N. Y. Supp. 1029; Matter of Hermance, 2 Dem. Sur. 1; Matter of Kellogg, 110 App. Div. 472, 96 N. Y. Supp. 965; People ex rel. Duryee v. Duryee, 109 App. Div. 533, 96 N. Y. Supp. 371), it does not take away the power of the surrogate to appoint guardians in the best interest of the infant. Section 80 of the Domestic Relations Law is only an amplification of an old English statute already ancient in New York. Matter of Scoville, 72 Misc. Rep. 312, 313, 131 N. Y. Supp. 205. To give such re-enactment the construction contended for by the counsel of Mrs. Begas would be to ignore the whole prior history of the statute itself, and to take away all discretion from the surrogate to act for the best interest of an infant whenever its parents were living. A similar amendment to the original of our statute regulating testamentary guardians occurred in England in 1886, when the "Guardianship of Infants Act" permitted the mother, as well as the father, to nominate a testamentary guardian. But the amendatory act has not in England altered the former law regulating a guardianship not testamentary. The English amendatory act is much more drastic than our own, and it regulates the appointment of guardians in case of divorce of parents, while our statute does not. We still abide by the earlier law, as is so often the case in this state.

[7] All things considered, it would seem to the surrogate that it is in the interest of the very young lady, now before the surrogate, that her opulent father should alone be named as her guardian, unless in so doing I shall violate some modern statute, or some established canon of equity by statute made relative to the nomination of such guardians.

[8] That the father is a divorced person is not an insuperable objection by the standard prescribed by the statute. If it were so, such disability would apply with at least equal force in this instance to the designation of the mother as such guardian, and thus I should be debarred from ever designating a divorced parent as a guardian of his or her children. Here there is no proof that the father's dereliction continues, as was the case in Wellesley v. Duke of Beaufort, 2 Bligh N. S. 124; so that I am not committing the custody of the young lady to any improper influence, if I do designate in this cause the father as her guardian. See Smith v. Smith and Gallini v. Gallini, reported in Forsyth's Custody of Infants (Ed. of 1850) 28. Were any such gross or continued dereliction on the part of the father now apparent, his designation would violate the canons of equity. But the mere fact that the father has once been guilty of misconduct does not, standing alone, preclude his appointment after a divorce. Rex v. Greenhill, 6 Nev. & Man. 244; 4 Ad. & El. 624; Estate of Rodman, Surr. Decs., N. Y. Co., 1904, p. 275. It is interesting to note that it was a rule of the Roman law also that, if children were committed to a divorced mother and she subsequently remarried, she then lost the right of control over the infants. Si pater, C. 5. 24; Nov. 94, 2. Whether a like rule prevailed in equity prior to 1846 I will not stop now to consider. This distinction has, however, been recognized to some extent by the surrogates (Holley v. Chamberlain, 1 Redf. Sur. 333; Swartout v. Swartout, 2 Redf. Sur. 52), although it is now said, for reasons which do not appeal to me as final, to be obsolete. Matter of Hermance, 2 Dem. Sur. 1.

While the Roman law is never controlling except in some testamentary causes, and on some questions of status, where it is conceded by the ecclesiastical courts to have an exceptional historical continuity, and to be very cogent, yet it is always instructive when the ratio decidendi of courts of equity or probate is concerned. See Strubbe v. Kings Co. Trust Co., 60 App. Div. 548, 550, 69 N. Y. Supp. 1092. But any foreign system of law is always to be invoked with discretion. Positive law, or the law of this time and place, is in practice always paramount in the administration of justice, and there is great danger in exploiting a legal theory by reference to the law of other times and places which, if ingeniously used, may furnish justification for the most opposed juridical rules. It is only under exceptional circumstances, not apparent here, that the Roman law is cogent in courts of equity or in the ecclesiastical courts and their successors, the courts of probate.

If the mother's contention before me, that a mother is under our present law required to be appointed in all cases the joint guardian of her infant, were true, which I do not admit, there is, nevertheless, in her case, an additional and insuperable objection. The statute of this state which she invokes was made for citizens. Mrs. Begas is now the wife of a nonresident alien, and consequently she herself is an alien and also a de facto nonresident. It was said long ago in equity that even a person residing out of the jurisdiction will not be appointed, for there must always be some one answerable to the court as guardian. Logan v. Fairlee, Jacob, 193. That this rule continues

·in force is apparent. The surrogate could not for an instant commit the person of this infant, who is a citizen of the United States and a resident of this county, to one who is a subject of a foreign power. So plain a principle needs no discussion. Matter of Hosford, 2 Redf. Sur. 168; Code Civ. Proc. § 2838. In so far as I am able, I am bound to see that this infant citizen of the United States is not expatriated or subjected to foreign influence of any kind. The old rule, analogous to the Roman law on the same subject (Nov. 22, c. 38), that a mother who is appointed guardian is an unsuitable guardian after her remarriage, because she is no longer sui juris (Anon., 8 Sim. 346; Matter of Cornall, 1 Beav. 347), no longer obtains in modern law under all circumstances (Matter of Hermance, 2 Redf. 1), but I am of the opinion that if the mother marry a foreigner this rule, for reasons quite distinct from those stated in Matter of Hermance, still obtains.

It is apparent to me after an extended consideration of this most important application, for it concerns the custody and the well-being of a child, that the father's petition to be appointed guardian of the infant's estate and person ought, in the sole interest of the infant, to be granted, and I am willing to so decree. If it were within my power, I should like, however, to condition the appointment by a proviso that the unhappy mother should have access to the young lady, within appropriate limits and with due regard to the conventions which ought to obtain in this instance; the mother being now married to Mr. Begas. But I entertain some doubt, under the decisions, of my power to prescribe or exact conditions, or to do more than nominate and appoint the guardian. It would seem that subsequent events must, as far as I am concerned, be governed by circumstances and the law then applicable to the conditions shown to exist. Matter of Lindley, 9 N. Y. Supp. 291; Derickson v. Derickson, 4 Dem. Sur. 295; Matter of Bolton, 159 N. Y. 135, 53 N. E. 756. That the Supreme Court, as successor in all respects to the chancellor, may, in a proper case shown, condition the appointment of a guardian, I have no doubt. Matter of Hubbard, 82 N. Y. 90. With me it may be, I do not say it is, otherwise.

It will be observed from the decisions cited that the power of the surrogate to control the appointment of the guardian by a provision according access of the mother to the infant is both affirmed and denied by former surrogates of distinction. If the proposition were an original one, I should have no hesitation in affirming that the statute conferring on the surrogates "the power and authority to appoint guardians which the chancellor had on December 31, 1846," meant precisely what it said, and that, if the chancellor could so condition the appointment, the surrogate can do so to some extent, and so thought the late Surrogate Rollins. Derickson v. Derickson, 4 Dem. · Sur. 295.

It is quite true that in some other respects, for example, where the chancellor's power was founded on his jurisdiction over trusts, or accrued to him originally as representative of the royal prerogative, the surrogate takes no such august power. There the Supreme Court alone, in so far as consistent with our democratic institutions, succeeds to the power and authority of the chancellor. Matter of Andrews, 1

Johns. Ch. 99; Matter of Dyer, 5 Paige, 534; Disbrow v. Henshaw, 8 Cow. 349; Matter of Camp, 126 N. Y. 391, 27 N. E. 799; Matter of Randall, 152 N. Y. 508, 516, 46 N. E. 945; Matter of Bolton, 159 N. Y. 135, 53 N. E. 756.

But the mere insertion of a provision that the mother may visit the infant in the surrogate's order appointing the father guardian of the infant is founded on no such distinction as that just indicated. It is a mere incident of a jurisdiction to make any order at all, and it stops with its exercise. It seems, therefore, to me that such a qualification may as safely be intrusted to the surrogate as to any other judicial officer of first instance in this state. It may be true "that originally the ordinary powers of a court of equity do not pertain to the surrogate," but, in this respect, the statute now reads otherwise (Code Civ. Proc. § 2821), and I see no reason why in this respect the language of the statute should not control. The modern tendency of legislation in this state is to confer on the surrogate a more efficient jurisdiction than formerly in the interest of the public. While I have some doubts concerning my power to so decree, as the decisions now stand, yet, in the interest of humanity, I will follow Rollins, S., and the order appointing the father guardian may provide for some access to the infant on the part of the mother.

The suggestion of the learned counsel for the mother that no appointment of guardian should be made by the surrogate, and that the matter should be left to work itself out, or to some future action of the German authorities, I am not at liberty to entertain for an instant, as a case has been presented to me within the statute, and I am bound to act in the premises.

The order may be settled on notice in conformity with our rule, and the amount of security then fixed, when I will also hear arguments as to the terms and conditions of the mother's access to her child, as well as the amount of the security to be required.

Decreed accordingly.