In the Matter of the Estate of ROBERT J. STRASENBURGH, Deceased.*

Surrogate's Court, Monroe County, June 6, 1929.

---

* Affd., 228 App. Div. 880.

*A. G. Dutcher,* for the executor.

*Castle & Pitch,* for the legatee.

*Sutherland & Dwyer,* for a creditor.

*Bowman & Van Schaick,* for a creditor.

*J. Sawyer Fitch,* special guardian.

FEELEY, S. Upon this intermediate accounting in this estate, it appeared that this testator, with four or five other gentlemen of financial standing in Rochester, had joined in indorsing certain corporate notes aggregating about $391,000; and that he had given his own notes for about $58,000. None of these has been renewed by the executor; and notices of protest have been served upon the estate. The expenses of liquidation will be about $30,000. These estate liabilities will reach a total of about $479,802. The assets comprise a corporate note of $15,000; land on Exchange street appraised at $64,000, and 7,670 shares of corporate stock of the R. J. Strasenburgh Company, appraised at $273,000. The total taxable estate was found to be $1,173,412.23. This court by its decision of December 7, 1928 (136 Misc. 91), held that the three legacies of this stock, by the 3d, 4th and 5th clauses of this will, totalling 4,800 shares, were legacies of such specific kind as to entitle the legatees to dividends declared thereon after the death of testator. There is no objection now raised to the delivery of those shares of stock to the legatees; but the 6th clause of the will, bequeathing only the income of some stock in the same corporation, now comes in question, in connection with said contingent liability, by reason of a demand by this legatee for delivery of the stock itself to her. The executor declined to do so, even though an individual bond were given, with the stock itself pledged as collateral thereto, to save the executor harmless from said contingent liability of testator.

The 6th clause of the will reads thus: " *Sixth.* I give to my wife, Stella G. Strasenburgh, the income for life arising or derived from two thousand six hundred and seventy (2670) shares of the capital stock of the R. J. Strasenburgh Company."

Upon the death of the widow, the testator gave to his three children each a lot of 890 shares of said capital stock, by the 7th, 8th and 9th clauses of his will; thereby evidently intending to dispose of the 2,670 shares which, under the 6th clause, were to furnish the widow their income for her lifetime.

By the subsequent clauses of the will, testator gives the residue

of his estate to the executor, expressly, in trust, for various parties, with certain express powers, privileges and directions to the trustee in regard to the trust property in its hands. This aspect is mentioned because the 6th clause now in question is not worded as an express trust; nor does it expressly direct the executor to pay the income to the widow legatee, but purports to give her the income on this stock without any right to invade the principal, and the remainder is given over directly to their children.

The counsel for the widow raises these questions: Does this 6th clause create a *specific legacy?* Is the widow entitled to possession of the stock from which the income is to derive? Does the contingent liability justify the refusal of the executor to deliver the stock to her?

For the reasons heretofore stated in the decision holding the three preceding legacies of this stock to be specific, as regards dividends declared after the testator's death, I am now of opinion that this legacy of income on a certain lot of that stock is a specific legacy in the same regard, and also in two other senses; in that if this stock failed to yield an income the legatee could not ask the equivalent from the residuary estate; and also in the sense that, if a marshaling of assets ever were necessary, this stock and this income would be among the last to be applied to meet the deficiency of less preferred assets; but beyond these aspects, I cannot find any authority for saying that the character of this legacy in so far as it is specific is determinative of the right to take possession of the shares of stock whence this specific income is to be derived; nor do I know of any to the contrary; but its specific characteristics look toward possession.

A more decisive feature as to possessory rights in such case is that the legacy is one of a life estate in personal property. This is clearly inferable from the ruling in the *Whitson Case* (53 N. Y. 479) where such a legatee was made to pay ordinary carrying charges, such as taxes. This legacy is obviously a bare right to receive income so long as the legatee lives. It confers on her no right to invade or consume the principal. There is no direction to the executors to pay her annually, such as appears in *Matter of Dewey* (153 N. Y. 63). This legatee could not be held to be a trustee for herself. (*Brown* v. *Spohr*, 180 N. Y. 201, 209.) The clauses of this will next after this relating to this life use and remainder over, set up express trusts of another lot of this stock for the life use of the widow also, with specific directions, as in the 14th clause, as to the trustee's control of the corpus and its investment.

This 6th clause now in question presents, therefore, in such context and phrasing, a mere life estate in personal property,

directly given without the interposition of a trust. The rules on possession in such case seem to have sprung out of the comestible nature of the articles, mentioned first in the following generalization, quoted from 40 Cyc. 1551: " A life estate in personal property gives the donee a right to consume or wear out such articles as cannot otherwise be enjoyed; and this is the rule whether the bequest is general or specific. * * * But the general rule is controlled by the intention of the testator showing how the tenant for life is to enjoy the estate."

This stock is that of the business corporation founded by this testator, bearing his name, now in control of his widow and children, one of whom is still actively engaged in it as an officer of the corporation; and such legacy carries with it some right to the widow to a voice in the corporate management or policy; but all that is not inconsistent with the stock being retained in the hands of the executors until the widow die. The case does not clearly meet the test, namely, whether " the scheme of the will, viewed in the light of the surrounding circumstances, indicates plainly that testator intended the life tenant should have possession." (*Matter of Rowland,* 153 N. Y. 327.)

We must fall back, then, on the general rule. Recently in the *Limburger Case* (128 Misc. 577, 579), where the widow was given, not only income for life, but a right to invade principal, it was said: " There is a vastly different result flowing from a legal life estate and a legal life estate with the addition of the *power of disposing of the principal during life* * * *. In the former case the life tenant has simply the income, and cannot take possession of the corpus of the property without giving security. (*Matter of Colwell,* 181 App. Div. 408.) In the latter case the rule is that security is not required."

In the *Colwell Case* (*supra*) the court said: " Cases have arisen presenting the question as to whether such an estate should be paid over to the life tenant without such security being given, but the absolute right to its payment and delivery when adequate and proper security has been tendered has never, so far as I am advised, been questioned."

In *Matter of McDougall* (141 N. Y. 21) a residue was given to the widow " to be used and enjoyed " by her during life or widowhood, the same to " be received and accepted " by her in lieu of dower, with remainder over, in either event, to persons named. The surrogate decreed all to her without a bond. This was finally reversed on the ground that the property was not of a kind which must be individually possessed in order to be enjoyed; and so, to get possession a bond must be given. There the Court of Appeals

said: " There was certainly no occasion for the possession of the corpus by the widow if she were to have no right to use anything more than the income, and the possession of the *corpus* would give her no right under the will to use any portion of it. The expression ' to be used and enjoyed by her ' gave her no enlarged interest * * * In such a case the legatee for life is not entitled to possession of the *corpus* without giving security, certainly not if he be insolvent or a non-resident. In other cases, where it has been held that the legatee was entitled unconditionally to the possession of the legacy without security, other facts existed, such as where the language of the will made it manifest that the testator intended to give the legatee power to use in his discretion some portion of the *corpus* of his estate for his support, or a right to dispose of it during his life by gift, or otherwise, or else it appeared that it was personal property of the nature of chattels which would require possession in order to enjoy the gift, and such possession was clearly contemplated by the testator, or the whole scheme of the will, or the terms of the particular legacy were such as to show that the testator intended * * * the life legatee to have possession thereof and trusted him not to waste or otherwise dispose of the *corpus.*"

Some cases in Connecticut have been cited to the effect that " generally, before making an order for such security, there must be some fact alleged and proved tending to show the property would be unsafe and insecure in the hands of the tenant for life " (*Matter of Camp*, 126 N. Y. 377); but in that case the tenant by the curtesy who was also guardian of his children had given a bond as guardian and had receipted as guardian for the proceeds of condemnation of the deceased wife's real estate. The remark quoted was part of the argument only.

It is implied in *Matter of Niles* (122 Misc. 17, 20, 21) that when testamentary provisions such as those now in question appear in wills bearing date of execution subsequent to the revision of 1914, the rule of the revision that those in the position of trustees to others should give security to the remaindermen, would require a bond to be given or exacted, unless the will exempted it.

As these remainders are vested, and the remaindermen are willing to join in giving a bond or in waiving any bond for their protection being required of the life tenant as such, the real question in the case is whether the contingent liabilities of the estate justify the executor in requiring a bond in that regard, if the remaindermen waive the bond a life tenant would in these circumstances, ordinarily, have to give in order to get possession of the corpus. It has been argued that there is a margin of solvency in this estate ample

enough to make such bond unnecessary; in other words, that while it is possible, it is not probable, these contingent liabilities would ultimately require recourse to these specific legacies. Using round numbers for convenience, the assets of this estate, as shown in the transfer tax deposition, are:

| | |
|---|---:|
| Real estate.................................... | $64,000 |
| Stocks and bonds............................... | 808,000 |
| Bonds and mortgages............................ | 115,000 |
| Bank deposits.................................. | 106,000 |
| Miscellaneous.................................. | 47,000 |
| | $1,148,000 |

| | |
|---|---:|
| Debts, including total of contingent liabilities, and administration expenses........................ | $258,000 |
| Specific legacies................................ | 499,000 |
| Specific devise (farm)........................... | 200,000 |
| Residuary estate................................ | 189,000 |

In these circumstances, the liquidation of the estate should not be closed by a total distribution unless an adequate bond is given by all the legatees, as retention of the residuary estate would not be enough to meet the total possible liability in question.

Let the decree of judicial settlement so provide.