Matter of the Application for the Appointment of a General Guardian of the Person and Estate of JOHN LONGER DE SAULLES, an Infant.

(Surrogate's Court, New York County, November, 1917.)

Surrogate's Court — jurisdiction of, to appoint guardians for infants — Supreme Court — statutes.
Jurisdiction — of Surrogate's Court — infants — divorce — guardians.

The jurisdiction of Surrogate's Court to appoint guardians for infants is concurrent with the jurisdiction of the Supreme Court and the court which first acquires jurisdiction in the orderly course of procedure should be protected in the exercise of its jurisdiction.

The jurisdiction of the Surrogate's Court to appoint guardians for infants is by statute made as extensive as the power of the former chancellor and the surrogate in making such appointments is bound by the principles prevailing in the former Court of Chancery.

Where by the terms of a decree of divorce the care and custody of an infant, the issue of the marriage, is limited to the joint lives of the parents, the decree has no possible operation after the death of either parent, in which event all matters of status of the parties and the infant are remitted to the common law, and where the infant is under the age of fourteen years the surrogate has jurisdiction to appoint a guardian for him.

Surrogate's Court, New York County, November, 1917.   [Vol. 101.

APPLICATION for the appointment of a guardian of an infant.

O'Gorman, Battle & Vandiver (James A. O'Gorman, of counsel), for petitioner.

Uterhart & Graham (George L. Ingraham, of counsel), for respondent.

FOWLER, S.   This is a competent and well-directed application to this court, having jurisdiction of the application, to appoint a guardian of an infant. The learned counsel for the mother of the infant presents at the outset the traditional and current argument, in substance, as I understand it, that the application would be better off on general principles in the Supreme Court, and that it ought not to be entertained in this court for particular reasons which I shall hereafter notice at some length, because of their gravity.

The application for the designation of a guardian to this court in this proceeding is made by the nearest male representative on the side of the deceased father of the infant. It is opposed on the part of the mother of the infant. But these are the nominal parties to the proceeding. The infant, although treated as a *res,* is the real party concerned. The application is based on the petition of the uncle *ex parte paterna.* The mother of the infant has interposed an answer and an amended answer to such petition. These constitute the pleadings in this proceeding. The amended answer and the brief present questions of jurisdiction which, however, may always be taken *ore tenus.*

Whenever a suggestion of lack of proper jurisdiction for any cause is made in any legal proceeding in a court of justice, it is incumbent on the officer presiding or to whom it is addressed to dispose of it before

proceeding to the merits of the controversy. The precise nature of the objection to my jurisdiction of the present application is contained in the brief submitted by my greatly esteemed friend, ex-Judge Ingraham, on the part of the mother resisting the application. I quote from the brief as follows: " Thus this application comes before the court, where it appears that the Supreme Court, a court having exclusive jurisdiction as to the custody of children in a controversy between the parents, where the action is for a divorce, has by its final judgment adjudged that the custody of this child should be awarded to the respondent. That judgment is under authority granted to the Supreme Court by section 1771 of the Code. The Supreme Court has also, as successor to the Court of Chancery, inherent jurisdiction to provide for and absolutely control the custody of infants confided to its care, and while the surrogate is given by the section of the Code cited the power to appoint a guardian of the person and property of an infant confided to its care, its power as to the custody of the infant must be subject to the control of the Supreme Court. It is the question of guardianship of either the person or property over which is vested concurrent jurisdiction. The question of the custody of a child after the appointment of a guardian is one that is vested solely in the Supreme Court, and that court would have jurisdiction at any time to decree that the custody of a child should not be confided to the guardian of its property, but to such other person as to the court would seem most conducive to the general welfare of the child."

If I understand the passage just quoted, it is in effect, inferentially, that the Supreme Court is the more authentic and suitable place, on general principles, to apply for a guardian of an infant whenever its parents have been in that court at any time. This

inference is not, I think, justifiable. This is the old assumption which has made the jurisdiction of this court so anomalous in our judicial system, and to my mind so often impaired its usefulness. The Surrogate's Court is a court of record long invested by authority of the law-making power with the old chancery jurisdiction to appoint guardians of infants. To be sure, the legislature, when investing the surrogates with this jurisdiction, did not deprive the Supreme Court of a like power invested in it as general successor to the former equitable jurisdiction in this state, nor could it do so without an amendment to the Constitution of the state. But in the course of modern legislation would seem evident a tendency, I think, to regard the Surrogate's Court as the more appropriate place for the appointment of guardians of infants. If we have due reference to the history of the jurisdiction of Surrogates' Courts, we are at liberty to conclude that it justifies the tendency to commit the care of infants to judges invested with the peculiar and particular jurisdiction of the surrogates, rather than to the judges exercising the hurried, complex and hybrid general jurisdiction of law courts and equity courts combined. But this is a mere matter of opinion, of no importance to the merits.

The jurisdiction of Surrogates' Courts to appoint guardians is now concurrent with the jurisdiction of the Supreme Court. *Matter of Lee,* 220 N. Y. 539. When jurisdictions are concurrent I have yet to learn that one is superior to the other in any respect. It must be patent to everybody that where two courts have concurrent jurisdictions, that which first acquires jurisdiction in the orderly course of procedure should be protected in the exercise of its jurisdiction, and that conflicting orders of other courts invoked subsequently are greatly to be deprecated in an orderly

state. The Surrogate's Court is in this instance the court first applied to. But as the vindication of the surrogate's jurisdiction over infants in the last analysis always rests with the Supreme Court, the degree of regularity and comity rightly to be expected by the community in cases of conflicts of jurisdiction, therefore, depends wholly on the action of the Supreme Court under our present system. The surrogate is thus rendered powerless to protect his own jurisdiction. This is another anomaly of the present judicial establishment. These anomalies are at times serious and sometimes degenerate into absurdity.

It is quite unnecessary at this time to go into the nature of the present jurisdiction of the Surrogates' Courts. It is sufficient to point out that they are courts of record, as Blackstone said, of a peculiar and particular kind, but though particular and peculiar in kind invested with one of the most extensive and ancient, original and exclusive jurisdictions known to our jurisprudence. It is to be observed that the nature and the powers of any court in this country are to be found only in the history of its jurisdiction. The court is nothing; the jurisdiction is everything. The history of jurisdiction was formerly much better understood in this country than at present. The old practice books published in this state in the early part of the preceding century are much more illuminating and instructive on matters of the jurisdiction of the Supreme Court and the Court of Chancery than are later commentaries. That the Surrogates' Courts of this state, although not now adequately protected by legislation, are invested with a sufficiently great jurisdiction to entitle their decrees to more consideration than they sometimes receive from other courts is readily apparent.

While vested with the chancellor's jurisdiction to

appoint guardians, there are some points made in the adjudications of other courts about the extent of the surrogate's power to control and direct the very guardian he designates. There was nothing in the law which so limited the surrogate's power, but the point has been made in other courts on some general principle I think not well founded. In legal theory the Surrogate's Court is not possessed of an inferior or trifling jurisdiction. In the country from which the surrogates' ready-made jurisdiction was transplanted as the product of centuries of legal conflict among English speaking peoples, very great judges, quite the equals of the common-law judges in England, have wielded the peculiar jurisdiction in question. A jurisdiction which has been exercised at intervals by such celebrated judges as Sir John Nicholl, Lord Stowell, Sir Herbert Jenner, Sir H. Jenner Fust and the late Lord St. Helier, and in this country by such profound judges as Surrogate Bradford and Surrogate David B. Ogden (before his surrogateship, regarded by his contemporaries as not second to Webster at the federal bar), cannot rightly be treated as an incompetent jurisdiction in discipline or in kind. Nor ought it be regarded as incompetent for the discharge of such ordinary judicial functions as the appointment of guardians. I regret that I cannot in justice to the jurisdiction conferred remit this application to the Supreme Court as requested for the further action of the learned justices sitting across the thoroughfare. As surrogate I have jurisdiction of this application, and as this jurisdiction has been duly invoked primarily I ought not to decline it, and indeed cannot rightly decline it in the due discharge of the obligations of my office.

The reason for such an unusual application as to decline jurisdiction is, I think, partly attributable to

some anomalies in the present situation of the judicial establishment in this state. The Surrogate's Court, although invested with the most extensive jurisdiction, as now amended and augmented, ever known in like courts is at times allowed to exercise no independent judicial discretion in many matters pending in this court. The discretion of this court by statute may be disregarded without even an assignment or pretense of errors. So in instances, the surrogate is authorized to render judgments which may by other statutes be disregarded and treated as a nullity, without even an assignment or pretense of error. For the law-making body to confer extended jurisdictions on a court so hampered and limited is the acme of absurdity in the science of government. In my private capacity I have no longer any interest in any such matter, but as a constituted judge I am bound to consider all matters affecting the jurisdiction committed to me. Passing all this, which ought, however, to be of some general interest to practicing lawyers in any scientifically organized and constructed state, I will proceed again to take up the merits of this particular application.

The amended answer sets up in bar of this application a prior adjudication of his Honor, Mr. Justice Finch, rendered in the Supreme Court of the state of New York. It appears that in an action brought by the mother against the father of the infant a decree of divorce *a vinculo* was entered in or about May, 1917, by the tenor of which it was provided as follows:

" Ordered, adjudged and decreed that the defendant pay to the plaintiff for her support and maintenance and for the support and maintenance of the issue of said marriage, John Longer de Saulles, Jr., the total sum of three hundred ($300) dollars per month, payable the first day of each month after the entry of this decree at the office of Prince & Nathan, New York City,

or such other place as plaintiff may designate in writing. If the plaintiff shall remarry, then the defendant shall not be required to make further payments to the plaintiff for her support and maintenance, but shall thereafter continue to pay to the plaintiff for the support and maintenance of the said child, unless the said child shall previously have attained his majority, the sum of one hundred and fifty dollars per month. After the said child shall have attained his majority the defendant shall not be required to make any further payments to the plaintiff for the support and maintenance of said child, but shall continue to pay to the plaintiff the sum of one hundred and fifty dollars per month for her support and maintenance, as hereinbefore directed, unless she has previously remarried. It is further

" Ordered, adjudged and decreed as follows:

" 1. Until England is at peace and the seas are safe for travel, John Longer de Saulles, Jr., the only child of the parties hereto, shall not be removed by either of his parents, nor shall either parent permit him to be removed from the United States of North America, and during such period the care and custody of said child shall be and is hereby awarded as to each year seven-twelfths of the time to the plaintiff and five-twelfths of the time to the defendant. The five-twelfths of each year during which the defendant shall have the custody of said child as aforesaid shall consist of separate periods of time, no one of which shall exceed one month in duration, unless the plaintiff shall agree in writing that said periods or any of them may be longer, and the dates of the beginning and the end of each of said periods shall be fixed by the defendant, but the defendant shall, at least two weeks prior to the beginning of any such period, give notice in writing to the plaintiff of the date of beginning and of the ending thereof.

" 2. After England is at peace and the seas are safe for travel and until said child shall attain the age of eight years, the care and custody of said child shall be and is hereby awarded to the defendant during the months of June to October, inclusive, in each year and to the plaintiff during the balance of each year; and the plaintiff shall be at liberty during all or any part of the period of seven months in each year when she is entitled to the care and custody of said child, to remove said child to England and there to maintain him, returning again with him, or sending him in the custody of some responsible person to the United States of North America, so as to arrive therein at or before the conclusion of the said period. Neither the plaintiff nor the defendant shall remove said child to or maintain said child in any other country than the United States of North America or England, unless' the written consent of the other party hereto shall first have been given thereto.

" 3. After the said child shall attain the age of eight years the defendant shall have the sole charge and direction of his education, which shall be at the defendant's expense.

" The care and custody of the said child from and after the time when he shall so attain the age of eight years shall, save as hereinafter provided, be, and it hereby is, awarded to the defendant during the months of October to June, inclusive, in each year, and to the plaintiff during the balance of each year; provided, however, that should the annual term of the school, college or other educational institution which the child · may at any time be attending or which the defendant proposes that the said child shall attend, for the current or ensuing school year begin earlier or later than the first day of October or end earlier or later than the first day of July, as the case may be, then the periods

during which the plaintiff and the defendant shall respectively have the care and custody of said child shall be enlarged or diminished accordingly, so that the plaintiff shall have the care and the custody of said child during the summer vacation and the defendant shall have the care and custody of said child during the annual term of such school, college or other educational institution; and provided further, that during the respective periods when either the plaintiff or the defendant shall be entitled as aforesaid to the care and custody of the said child, the other party hereto not then having the care and custody of said child shall be entitled to remove the said child from the care and custody of the other party, and to keep said child in his or her care and custody for half of the time during which the other party would otherwise have the care and custody of said child, but that neither party so removing said child from the custody of the other shall keep or maintain him away from the custody of the other for a longer period than one month at any one time, and that either party so removing and keeping said child shall, at least two weeks prior to the time of such intended removal, give notice in writing to the other of the date of such removal and of the date when such child will be returned to the custody of the other party. Neither party so removing such child from the custody of the other party for such period or periods of one month or less shall remove or keep him outside of the country where he was at the time of such removal, nor shall either party exercise such power of removal of the child from the custody of the other party in such manner or under such circumstances as to interfere with the said child's attendance at school, college or such other educational institution as he may then be attending.

'' During the time when the plaintiff is entitled to the care and custody of said child (that is, during the months of July, August and September, or the summer vacation as aforesaid), the plaintiff may remove and keep said child in England, returning again with him or sending him in the custody of some responsible person to the United States of North America, so as to arrive therein at or before the conclusion of said period.

'' Neither the plaintiff nor the defendant shall remove said child or keep or maintain said child in any other country than the United States of North America, or England, unless the written consent of the other party shall first have been given thereto.

'' 4. While the child is in the custody of either the plaintiff or the defendant, as aforesaid, under the provisions of any of the preceding paragraphs ' 1 ' to ' 3,' inclusive, and whether within or without the United States of North America, as the case may be, the other party not then having the care and custody of said child shall, in addition to being entitled to such care and custody thereof, as is hereinbefore provided, be permitted at any time or times when it will not interfere with the proper care of the child by the other party, and within reasonable hours and upon reasonable notice to the other party, be permitted to visit the said child and to remove the said child from the custody of the other party for a period of not exceeding three hours at any one time, returning said child to the custody of the other party at the conclusion of said period.

'' 5. Each party hereto, while the child is in his or her custody, shall keep the other party at all times informed as to where the said child is being kept or maintained.''

Such is the tenor of the decree in the Supreme Court.

Surrogate's Court, New York County, November, 1917.    [Vol. 101.

The question now presented is, Is this decree of the Supreme Court set forth above a bar to the exercise of my judicial action in the present proceeding? On examination it purports, I think, to be a decree fixing the custody of an infant, the issue of the dissolved marriage, only during the joint lives of the parties to the action and the minority of the infant. The decree does not appoint a guardian of the child. Such decree was rendered in a divorce action in which a marriage status was the veritable *res* in the contention. The decree incidentally only fixed the custody of the child of the marriage and it partitioned the rights to its control and custody between the parents of the unhappy child during such period and no longer. To decree a custody beyond such a period would be futile. If the decree, as argued, is now in force it must be in force in its entirety and the deceased parent continues entitled to control during the prescribed portion of the year, which is an absurdity. I have yet to learn that the Supreme Court, although for two centuries a great and useful factor in the upbuilding of the important common-law .community, has ever before assumed the power to determine or enforce the rights *qua* rights of those who dwell in the regions of the immortal. It is a universal principle of law, without a single exception, that at death the rights of a deceased either cease absolutely or devolve *eo instanto* on the living. I am satisfied that the decree of the Supreme Court could have no rational or legal operation beyond the joint lives of the parents.

But if the decree has a longer operation as contended, how far were the rights of the male stock of the parental family of the infant adjudicated in such divorce action mentioned? A divorce action is one *in rem;* it alters a *status* of two persons for the future, but the only *res* involved in the action is the *status* of

the spouses. As to this single matter, the decree of divorce would be binding on all the world whether parties or not. As to the custody of the infant, the judgment is in another situation. It is not *in rem* and is, therefore, not binding on those not parties to it. The power of the judges of the Supreme Court to provide for the control of infants in a divorce action is wholly statutory, and is due to a statute first enacted in 1815, consolidated in the original Revised Statutes. 2 R. S. 148, § 59; *Livingston* v. *Livingston,* 173 N. Y. 377, affg. 74 App. Div. 261; *Sistare* v. *Sistare,* 218 U. S. 1, 20.

The paternal stock of the infant were not bound by the part of the decree not *in rem,* even if it attempted to fix the custody of the infant beyond the joint lives of the parents. If the male stock of the infant's family have any rights of custody and control over the infant of their race during the mother's lifetime, it is therefore open to them to assert them here, *non obstante* the decree in the divorce action. But there is another and more delicate consideration submitted to me. If the Supreme Court has attempted to adjudge the control and custody of the infant beyond its father's lifetime, even though without authority so to do, it might be indecorous for me to correct it or to entertain the present application. In that event Judge Ingraham's suggestion that the surrogate should not act in this matter at this time is entitled to much consideration from me. But I am satisfied that the decree of the Supreme Court adjudging the control of the parents and their issue could not intend any operation beyond the death of either parent. Certainly it could have no possible operation after the death of the father and it is but fair, I think, to the Supreme Court to presume that it did not intend to do what it could not do. On the happening of the death of the father all matters of status

of the parties and their infant ceased to be affected by the decree of divorce and were remitted to the common law, which alone fixed their further status. The decree in the divorce action, in other words, ceased on the death of the father to have any further future operation in my humble opinion. This being so, there is no valid reason why I should not entertain the present application, and indeed I should be derelict in my duty if I declined so to do.

The surrogates' jurisdiction over infants was first conferred by a statute of 1802. The present statute is more modern in phraseology. Code Civ. Pro. § 2643. In *Matter of Wagner*, 75 Misc. Rep. 419, 425, I referred to the fact that the statutory power of the surrogate to appoint guardians was made by express limitation as extensive as the power of the former chancellor. There was great good sense in this legislative reference to the power of the chancellor, as the former chancellors had a prescribed canon, practically closed, determining every principle on which the appointments of chancery guardians should proceed in all instances. The subsequent decisions on chancery guardianships in this state, although many, certainly have evolved nothing new or original. Their predecessors, the chancellors, had covered the whole ground in their usual formal, stately and conclusive fashion.

It is obvious from its terms that the statute intended to confer on the surrogate the power to appoint what were formerly known as " chancery guardians " only. The surrogate can appoint no other kind of guardians, except special guardians, who are merely ordinary guardians *ad litem*. A chancery guardianship is a temporary parent of a particular kind. At common law guardians were of several varieties. The father, and afterwards the mother in special cases, were at common law guardians by nature and nurture which

denoted the personal rights to the custody and care of their infant child's person, or at least of the eldest male child's person. A guardian in socage referred to the estate in lands of the infant and could not by any possibility devolve on any one entitled to the succession to the lands. A testamentary guardian, sometimes called a statutory guardian, was one created by last will of the father, and in this state now of the mother, the father being dead. Both guardians in socage and testamentary guardians linger on in our law. But all these common-law guardianships, after the abolition of tenure, tended both in this state and in England to be supplanted by the guardians designated by the chancellor, the official general and supreme guardian of all infants. I have had occasion often in this court to consider this subject, and need not dwell on it. *Matter of Scoville,* 72 Misc. Rep. 310, 313; *Matter of Wagner,* 75 id. 419; *Matter of Mancini,* 89 id. 83. As already remarked, the law regulating chancery guardians was practically a closed canon when the surrogates were invested with the power to appoint "chancery guardians" as fully as the chancellor could have done in this state. There are many recent decisions reported, but I detect no new principles enounced, even in the highest quarter. What then are the occasions when the chancellor could and would appoint guardians for infants, for this is made the precise measure of the surrogates' present authority? After the case of *Wellesley* v. *Duke of Beaufort,* 2 Russel, 1, in England, and *Wood* v. *Wood,* 5 Paige, 605, in this state, it was recognized that the chancellor could supplant pretty much all common-law guardianships if a proper case was made. This left the only question, When is a proper case made? Principles which would bind and control the chancellor would bind his statutory successor, the surrogate. In

Surrogate's Court, New York County, November, 1917. [Vol. 101.

modern law chancery guardianships are the more common form.

In this matter now before me at the present moment, the mother is temporarily, at least, incapable of having the custody or control of either the person or property of the very young child of her former marriage. The mother for the moment is in the position of one civilly dead. The child is thus left subject to no legal control or care whatever, the father being actually dead. There is no other human being now in existence who has either legal authority to care for the child or who is legally responsible for its nurture and well-being. The child is thus in the position of a waif, yet it has an estate and has had traditionally at least good home surroundings, both of the parents having been, I understand, well circumstanced. In equity a parent who is incapable for any cause of taking care of her child is *prima facie* unfit to have its custody. This was the chancery rule. Thus the situation presents the very case where the child would have fallen under the superintending influence and control of the former chancellor by mere operation of law. As his actual control existed only in legal theory, the chancellor would have at once exercised his power to appoint a guardian of the infant, either *suo motu,* or on a direct application. To be sure the mother's disability in this matter above indicated may not endure permanently, but at present it exists and it is not possible, nay, it would be highly reprehensible, for a judge, expressly invested with the chancellor's power to remedy the infant's present situation, to decline for any reason to act in the premises, even though the request not to act was based, as here, on an appeal to sympathy and clemency for one laboring under great misfortune. This plea should be addressed to the promovents in this matter. I regret that it cannot

Misc.]    Surrogate's Court, New York County, November, 1917.

properly be entertained by the surrogate in a pending proceeding in his court.

The mother being incapable, for the moment at least, of caring for the infant in court, the next question here is as to the superior right of the paternal relatives to receive the temporary guardianship of an infant of their race and name. The jurisprudence of the common law, as every other system of jurisprudence, has a complete scheme of family law, sometimes explicit and at others implicit, but always adequate. At common law as a general principle the rights of the male stock are regarded as superior to those of the female; the wise and conservative common law of our race did not regard marriage as a mere partnership in which the partners enjoyed equal rights. Nor does it now regard the guardianship of infants as well bestowed when given to maternal relatives in preference to the paternal relatives. Chancellor Kent states that in chancery the order of appointment of guardians of the person is first to the paternal grandfather, if any; next to the maternal grandfather, if any; then to the paternal uncles, and last to the maternal uncles. While this order presented is not now invariable in this country it is entitled to attention here, in view of the terms of the jurisdiction conferred on the surrogate.

In this matter neither grandfather applies. The paternal uncle being next in order does apply, and his prior right to custody is entitled to close attention before it is disregarded. The rights of the paternal stock are in the family law of this state superior to that of the mother. The common law is the fundamental law of this state, and it is not to be ignored on some theory that more modern judicial conceptions are superior to it. It is the common law of English-speaking peoples, and not our peculiar political institutions, which has perfected our civilization and made success-

ful even our political institutions. But the prior right of the paternal relatives in chancery was subject to the ordinary limitations; they must have been proper persons in character and position before the custody of the infant would be relegated to them by the chancellor. The practice in chancery was first to require a master's report, approving of the person and the security offered. This was but common prudence in the exercise of a jurisdiction at once so serious and so responsible.

In accordance with settled principles I should grant the application of the uncle. But the amended answer sets up that he is not a fit and proper person and that his ordinary residence has been the scene of debaucheries in times past. This raises a distinct issue which must be tried out before the application would be granted by the chancellor. Such an appropriate practice implicitly follows the proper exercise of jurisdiction by the surrogate. While I have the power to refer the hearing of such issue, as was formerly done, it has been my practice in this class of cases to take the evidence myself in order that I might inspect the parties and their witnesses. I shall accordingly set this matter down for hearing before me upon two weeks' cross-notice given by the parties.

The appointment of a guardian in this matter is occasioned by reason of the mother's present disability. If that disability is removed the mother is *eo instante* remitted to her common-law control and right to custody. *Matter of Deming,* 10 Johns. 232, 483. I do not quite understand why the Supreme Court originally saw fit to deprive the mother, being the innocent party to the divorce action, of the sole custody of her infant under fourteen, ordinarily granted to innocent parties. No doubt there were good reasons. In England special acts of Parliament were regarded as

necessary to alter the common-law rights of parents to custody, *e. g.*, 2 & 3 Vict. chap. 54. The New York acts on this subject do not go so far as the English acts.

Meanwhile, if any immediate or temporary order committing the infant to judicial custody and control is necessary, it is agreed, I understand, on the part of the maternal relatives and not opposed by the paternal relatives, that Mrs. Louisa V. Hecksher (with whom the infant now is) is a proper custodian, and an order to that effect can be entered. I should like the order to provide that the mother may see the infant whenever permitted, although there is some question made, notwithstanding the express terms of the surrogate's jurisdiction, on his power to do anything but nominate guardians. In Pennsylvania the Orphans' Court is not so limited, and until I am advised by the final decisions of the courts of this state to the contrary I shall assume that I have the ordinary power of control over guardians I am called upon to appoint.

Decreed accordingly.